UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| v. | ) | No. 21-CR-71 |
| BRYAN VALDEZ-ESPINOSA, Defendant | ) | |

**DEFENDANT BRYAN VALDEZ-ESPINOSA'S SENTENCING MEMORANDUM**

Now comes the defendant Bryan Valdez-Espinosa, by and through undersigned counsel, and respectfully submits this Sentencing Memorandum. Bryan does not, in any respect, seek to depreciate or minimize the gravity of his offense of conviction. He does, however, seek via this Sentencing Memorandum to place his conduct in the proper context, as well as to provide the Court with a full, three-dimensional understanding of the human being whose fate now rests in its hands.

## I. Personal Background

For the entirety of his young life, excluding the five-day period giving rise to the charges in this case, Bryan has proven to be a good person. Attached to this Memorandum are nine letters of support from family and friends which together bring into sharp focus the person now facing sentencing: a devoted son, a caring and supportive family member, a loving boyfriend, and an empathetic and dependable friend to many. As detailed in these letters, Bryan has made a habit of quietly helping those in need (asking for and expecting nothing in return), steadfastly offered the kind of friendship any person would cherish, and provided an unwavering foundation

of support and care to his family and friends. Bryan's brother describes him as "a loving, caring and giving person, even when he has nothing, he still finds a way to give." Ex. 6, Letter from Hendrick Valdez. His girlfriend echoes, "Bryan is a truly caring and compassionate person who always puts others first." Ex. 7, Letter from Stephanie Diaz. A host of other figures from Bryan's life strike a similar chord. *See, e.g.*, Ex. 8, Letter from Vency Reyes (former boss describing Bryan as "a compassionate and caring individual, always willing to help others and going above and beyond to support his family and friends"); Ex. 9, Letter from Francis Diaz (high school friend describing Bryan as "a hardworking individual with a wealth of ideas, who is always willing to lend a hand to anyone in need" and "to listen and offer guidance in a non-judgmental manner").

Bryan is 23 years old. He comes from a hard-working immigrant family. He was born in the Dominican Republic, and moved to the Netherlands at 10-years-old with his mother, after she divorced his father. *See* PSR ¶¶ 62-63. Bryan lived in Amsterdam for approximately 18 months. *See id.* ¶ 64. While Bryan generally enjoyed life there, the language barrier was difficult, and he experienced verbal abuse from the man his mother was dating. *See id.* ¶¶ 64-65. In 2012 or 2013, Bryan and his mother moved to New Jersey. *See id.* ¶ 65.

While in New Jersey, Bryan learned English and immersed himself in sports. *See id.* ¶ 66. He wanted to play high school basketball, but, because his mother needed financial help, he got a job instead. *See id.* As Bryan's mother explains it, she needed his help paying for such basic necessities as "rent, groceries, internet, [and] light." Ex. 1, Letter from Ada Iris Espinosa. He learned to cut hair and started working at a local barbershop to support his family, while remaining in school at the same time. *See* PSR ¶ 67; Ex. 8, Letter from Vency Reyes (explaining

that seven years ago, at the age of approximately 16, Bryan "came to my shop looking for work to help support his mother"). Bryan eventually began working towards obtaining a real estate license, taking real estate classes during the day but continuing to attend night school until he earned his diploma. *See* PSR ¶ 67.[1] Bryan is currently making plans to attend school to become a licensed barber. He also recently began working as a delivery person for Mission Foods.

Bryan continues to support his family to this day, even under the substantial personal strain of this case. His mother, who is recently divorced, suffers from a host of medical conditions, including an ovarian fibroid that will require surgical removal and a relatively recent surgery to remove her gall bladder. Ex. 1, Letter from Ada Iris Espinosa. As a result, Bryan's mother experiences continuous bleeding, anemia, dizziness, and severe stomach pain. *See id.* These symptoms render her unable to work or to keep up with basic household chores. *See id.* Bryan, who lives with his mother, not only helps her maintain the household, but is also helping her to try and save enough money to pay for the surgery she needs. *See id.*

Bryan's eagerness to help those in need has extended beyond his immediate family. In early 2020, the COVID-19 pandemic upended the world we had all come to take for granted and caused many, if not most, Americans to fear for our health, families, jobs, and even our lives. These unprecedented circumstances brought out the best in Bryan. Near the beginning of the pandemic, his brother's girlfriend's family became very sick. *See* Ex. 2, Letter from Genesis Mora Leon; Ex. 3, Letter from Adela Mora Leon. As Bryan's brother's girlfriend, Genesis Mora Leon, puts it, "Bryan opened the doors to his home, putting his health at risk, and allowed me,

---

[1] The defense submits that the foregoing facts belie the government's characterization of Bryan as "averse to hard work, instead looking for the quick score." Dkt. 62 at 3-4.

my mom, and my two little girls to stay with him until we recovered. He would wake up early every day to make the girls breakfast and make sure they were doing well. He . . . worked tirelessly to provide for our family, even in the face of financial difficulties and job loss. If it weren't for him, I don't know how I would have been able to support my family during the pandemic." Ex. 2. Ms. Mora Leon's mother, Adela Mora Leon, adds, "Bryan spent countless hours at home, helping me to recover, keeping me safe, and making sure I was comfortable. He also helped me with my medication and did everything he could to lift my spirits . . . ." Ex. 3.

In another concrete and striking example of Bryan's selflessness, he allowed a friend and his family to live with him when they were homeless. *See* Ex. 4, Letter from Jeury Feliz. Bryan provided the same friend with crucial support after his mother's suicide attempt and during the course of his own struggles with depression. *See id.* In the friend's words, Bryan's "belief in me and his teachings on how to be true to myself, gain knowledge, and understand the importance of loyalty have helped me to become a better person. I am eternally grateful for all that he has done for me and my family." *Id.* This particular friend is not alone in his experience with Bryan. *See* Ex. 5, Letter from Angel Ramos (describing Bryan as "a friend that became a brother" and explaining, "[e]ver since the first day we met I remember telling him about my problems. While everybody partied, we talked about how bad things were going for me in my life. He listened without judging & gave me advice. . . . When I needed a place to stay at a point in my life he willingly offered his couch without asking for anything in return . . . .").

While the foregoing cannot negate Bryan's guilt, it does place in appropriate context the five-day lapse of judgment that brings him before this Court. That Bryan has continued to demonstrate unwavering selflessness even in the most difficult circumstances (*i.e.*, at the height

of the COVID-19 pandemic and during the pendency of this criminal case) speaks volumes regarding the character of this 23-year-old man.

## II. Sentencing Guideline Calculations

"It is the government's burden at sentencing to prove sentencing enhancement factors by a preponderance of the evidence . . . ." *United States v. Lacouture*, 835 F.3d 187, 189-90 (1st Cir. 2016) (citation omitted). Accordingly, such an enhancement "cannot be applied unless the government . . . prove[s] the predicate fact or facts" to be more likely true than untrue. *Id.* at 191 n.6.

### a. *Loss enhancement*

#### i. The government has failed to prove by a preponderance of the evidence that the majority of the loss attributable to the conspiracy was reasonably foreseeable to Bryan

The government seeks to impose a whopping 12-level enhancement based on the sole fact of the loss amount "attributable to the conspiracy of which [Bryan] was a member." Dkt. 56 ¶ 4d; *see also* PSR ¶ 45. It is blackletter law that a defendant is "not automatically . . . responsible for all the losses caused by [a] jointly undertaken criminal activity." *United States v. Pizarro-Berrios*, 448 F.3d 1, 6 (1st Cir. 2006). Rather, even in the context of conspiracy, the Court "must make an individualized determination regarding the amount of loss attributable to, or reasonably foreseeable by, a [particular] defendant." *Id.* at 7. The defendant's "awareness of the inner workings of [the] conspiracy," or lack thereof, is "often highly probative" on this issue. *Id.* at 9 (citation omitted). Here, the government has not proven Bryan to be anything other than a low-level member of the conspiracy, essentially acting as a courier to pick-up and deliver cash. *Cf. United States v. Delima*, 886 F.3d 64, 73 (1st Cir. 2018) (citation omitted) (attributing full

scope of conspiracy to defendant who was "an integral member" aware of even the "smallest detail[s]"); *United States v. Lilly*, 13 F.3d 15, 18 (1st Cir. 1994) ("It stands to reason that the majordomo of a scheme, having set the stage, probably will be saddled with more 'relevant conduct' than a bit player."). He is not so much as mentioned in connection with the vast majority of the victims outlined in the PSR. Rather, on this record, the only intended loss that should be attributed to Bryan is the $10,000 he attempted to obtain from one particular victim. *See* PSR ¶¶ 31, 33. Accordingly, the U.S.S.G. § 2B1.1(b)(1) enhancement should be only 2 levels.[2]

There are only two other victims to whom the PSR connects Bryan in any manner whatsoever. The PSR states that one victim provided $15,500 cash to co-defendant Diego Alarcon in a Harbor One Bank envelope. Alarcon "walked down the street and went out of sight." PSR ¶ 23. A torn Harbor One Bank envelope was subsequently found in Bryan's car. *See id.* The defense submits that the mere recovery of this envelope from a large regional bank, with 31 branches across Southeastern Massachusetts and Rhode Island,[3] does not provide a sufficient basis to attribute this victim's loss to Bryan. The PSR also states that Alarcon took $9,500 from WH,[4] "which he soon handed off to" Bryan. PSR ¶ 19. The document provides no details regarding the circumstances of the alleged "hand[] off." The government's Opposition to Defendant's Objections to PSR suggests that the assertion is based upon "cell-site information"

---

[2] Bryan's co-defendants, by contrast, each interacted directly with several victims, rendering the government's argument that the entire loss amount should be attributed to them more persuasive. *See infra* 16.

[3] *See* HarborOne Bank, About Us, *available at* https://www.harborone.come/about-us/hello.

[4] Because the PSR remains under seal, this Memorandum identifies the victims only by initials.

allegedly showing that, after Alarcon took the money, "he traveled straight to the area of 10 Weybosset Street in Providence where [Bryan] was located." Dkt. 84 at 7-8.[5] But, according to the government's own memorandum, Bryan and Alarcon were "friends" who traveled to Rhode Island together. *Id.* at 5. The mere fact that they were in the same general vicinity at an unspecified time shortly after Alarcon took money from a victim does not constitute proof by a preponderance of the evidence that Bryan was a knowing participant in that conduct.[6] In any event, even assuming that the foregoing two loss amounts are attributable to Bryan, that would bring the total to $35,000 and a corresponding enhancement of 4 (not 12) levels.

In arguing for a 12-level enhancement, the government relies in large part on assertions in its own Opposition, without record citations. The government has advised undersigned counsel that the underlying information was provided by agents. While the defense appreciates and accepts the government's representation on this point, it nonetheless contends that the Court should decline to rely on the government's assertions in imposing sentence. As the government's own authorities recognize, the record for a sentencing proceeding after a guilty plea generally consists of "the plea colloquy, the undisputed portions of the [PSR], and the transcript of the sentencing hearing." *United States v. Arias-Mercedes*, 901 F.3d 1, 4 (1st Cir. 2018). To the extent the government was in possession of additional evidence that it believed supported the sentencing enhancements it seeks in this case, it should have provided such

[5] As discussed below, the defense objects to the government's reliance upon such extra-record materials.

[6] A similar analysis applies to the government's reliance upon phone contact between Bryan and Alarcon. *See* Dkt. 84 at 7. The government provides no information regarding the contents of any communications between the two.

evidence to probation for inclusion in the PSR.

Additionally, sentencing determinations must be based upon evidence with "sufficient indicia of reliability to support its probable accuracy." *United States v. Torres-Landrua*, 783 F.3d 58, 64 (1st Cir. 2015) (citation omitted). Even facts included in the PSR, where an objection is raised, must possess an "adequate evidentiary basis." *United States v. Carrion-Melendez*, 26 F.4th 508, 513 (1st Cir. 2022) (citation omitted) (holding that district court abused its discretion by considering allegation that was "multiple-level hearsay . . . made by an unnamed source" which was "not detailed" and "uncorroborated"). This requirement is rooted in the Constitutional guarantee of Due Process. *See United States v. Colon-Maldonado*, 953 F.3d 1, 10 (1st Cir. 2020). Hearsay evidence raises especially acute reliability concerns:

> [O]ut-of-court statements . . . lack the conventional indicia of reliability: they are usually not made under oath or other circumstances [like penalty of perjury] that impress the speaker with the solemnity of his [or her] statements; the declarant's word is not subject to cross-examination; and he [or she] is not available in order that his [or her] demeanor and credibility may be assessed by the [factfinder].

*Id.* (quoting *Chambers v. Mississippi*, 410 U.S. 284, 298 (1973)). Accordingly, for a sentence to be enhanced "based on hearsay, there must be other signs (other 'indicia of trustworthiness') to permit a reasoned conclusion that the statements are still reliable." *Id.* Respectfully, unsourced assertions in a government pleading lack the required indicia of trustworthiness. *Cf. id.* at 13 (holding that district court's reliance on "unsubstantiated allegations in a charging document . . . was clear error").

Even setting all of the foregoing issues aside, the most problematic aspect of the government's loss argument is its incompleteness. Beyond the attempted $10,000 fraud for

which the defense concedes Bryan's responsibility and the two other incidents to which the PSR attempts to connect him indirectly, the government specifically discusses only two other thefts. In both cases, after Alarcon took cash from the victim, he traveled to the "area" near where Bryan was allegedly located. *See* Dkt. 84 at 7-8. For reasons explained above, the defense contends that this is an insufficient basis to find Bryan responsible for these losses. But, more fundamentally, even if the Court accepts all of the government's representations and finds them sufficient, the government has accounted for only a relatively small fraction ($64,700 or about 18%) of the total loss. The government's mere assertion that similar evidence exists regarding "several of the other victims" falls well-short of the reliability required for sentencing enhancements. Dkt. 84 at 7. The defense submits that it cannot be simply assumed, without supporting evidence or even specific argument, that the nearly $300,000 remaining loss was reasonably foreseeable to Bryan. Rather, binding caselaw requires an "individualized determination." *Pizarro-Berrios*, 448 F.3d at 7.

The PSR facially indicates that large portions of the loss that the government seeks to attribute to Bryan resulted from conduct in which he is not alleged to have had any involvement whatsoever. *See* PSR ¶ 20 (alleging that "unnamed conspirators" convinced WH "to both wire money to the Dominican Republic and purchase Target and Macy's gift cards for an additional loss of $68,000"),[7] ¶ 24 (alleging that unidentified conspirator called SH and instructed her to

[7] The documentation submitted by WH in support of his claimed loss indicates that the wire transfers (totaling over $4,500) began on June 12, 2021, after Bryan had been arrested and beyond the temporal scope of the conspiracy to which he pled guilty. *See* Dkt. 63-3 at 13; Dkt. 56 ¶ 4. Most of the gift cards (accounting for more than $68,000) were similarly purchased after Bryan's arrest. *See* Dkt. 63-3 at 20.

send over $60,000 in cash "via UPS" to an address in Florida).[8] At the very least, these amounts should be excluded from the loss attributable to Bryan.

ii. Even assuming the loss was reasonably foreseeable to Bryan, this Court should apply a downward variance for policy disagreement with the fraud guideline

As this Court is fully aware, Supreme Court and First Circuit precedents confer broad discretion to determine the appropriate sentence in individual cases. *See, e.g.*, *Gall v. United States*, 552 U.S. 38 (2007); *United States v. Thurston*, 544 F.3d 22, 25-26 (1st Cir. 2008) (affirming "dramatic" downward variance under *Gall*). No longer are district courts bound by the strictures of the guidelines or even permitted to presume that the applicable guideline range is reasonable. *See Gall*, 552 U.S. at 49-50. Rather, "once the [guideline sentencing range ("GSR")] is properly calculated, sentencing becomes a judgment call for the court, and the court may construct a sentence varying from the GSR based on a complex of factors whose interplay and precise weight cannot even be precisely described." *United States v. Innarelli*, 524 F.3d 286, 292 (1st Cir. 2008) (citation omitted), *superseded on other grounds*. Moreover, under *Kimbrough v. United States*, 552 U.S. 85 (2007), courts are free to deviate from the guidelines even where doing so "contravenes a broad policy pronouncement of the Sentencing Commission." *United States v. Politano*, 522 F.3d 69, 74 (1st Cir. 2008) (citation omitted); *see also, e.g.*, *United States v. Vanvliet*, 542 F.3d 259, 271 (1st Cir. 2008) (relying on *Kimbrough* for proposition "that district courts legitimately may cite their own disagreements with Guidelines policy as justification for imposing a below-Guidelines sentence").

[8] SH's declaration of loss form provided to the defense on February 3, 2023 expressly identifies $64,000 in claimed loss as having been incurred on June 14 and 15, 2021, again after Bryan's arrest and beyond the temporal scope of the conspiracy to which Bryan pled guilty.

Few guideline provisions have been subject to more consistent criticism than that applicable to fraud offenses. Courts have been particularly skeptical of that guideline's loss table, which provides for very large sentencing enhancements based solely on aggregate loss amount. "By making a Guidelines sentence turn, for all practical purposes, on this single factor, the Sentencing Commission effectively ignored the statutory requirement that federal sentencing take many factors into account, *see* 18 U.S.C. § 3553(a), and, by contrast, effectively guaranteed that many such sentences would be irrational on their face." *United States v. Gupta*, 904 F. Supp. 2d 349, 351 (S.D.N.Y. 2012). As Judge Rakoff has poignantly explained:

> The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding-up of a small set of numbers artificially assigned to a few arbitrarily-selected variables ***wars with common sense***. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to ***bizarre results***.

*Id.* at 350 (emphasis added). The guideline's narrow focus on the mathematics of a loss or intended loss, without distinguishing the nature and extent of the particular defendant's conduct that contributed to the loss, the extent to which the defendant monetarily gained from the offense, and countless other factors that distinguish one fraud offense from another cannot help but result in unreliability and irrationality in sentencing.

Beyond this general concern about the fraud guideline's sentencing by numbers approach, several judges have criticized the loss table on the grounds that the astronomical sentencing increases it calls for are utterly lacking in empirical support. Indeed:

> the numbers assigned by the Sentencing Commission to various sentencing factors appear to be more the product of ***speculation, whim, or abstract number-crunching*** than of any rigorous methodology—thus maximizing the risk of injustice. . . . The

> Guidelines' calculations for this offense are no longer tied to the mean of what federal judges had previously imposed for such crimes, but instead reflect an ever more draconian approach to white collar crime, unsupported by any empirical data.

*Id.* at 351 (emphasis added); *see also United States v. Musgrave*, 647 F. App'x 529, 538 (6th Cir. 2016) (unpublished) ("[T]here is reason to believe that, because the loss Guidelines were not developed using an empirical approach based on data about past sentencing practices, it is particularly appropriate for variances."); *United States v. Corsey*, 723 F.3d 366, 380 (2d. Cir. 2013) (Underhill, J., concurring) ("The three sets of amendments to the loss table of the fraud guideline . . . have effectively multiplied several times the recommended sentence applicable in 1987 for large-loss frauds, which itself was set higher than historic sentences. Each of the three increases in the recommended Guideline ranges for fraud crimes was directed by Congress, without the benefit of empirical study of actual fraud sentences by the Sentencing Commission.").

As the Second Circuit has expressly recognized, disagreement with the Sentencing Commission's "unusual[]" approach to fraud "is a circumstance that a sentencing court is entitled to consider" in imposing a variant sentence. *United States v. Algahaim*, 842 F.3d 796, 800 (2d Cir. 2016) (citing *Kimbrough*, 552 U.S. at 101). And district courts have, in practice, repeatedly varied downward from large GSRs driven by loss amount. In doing so, several courts have been harshly critical of the fraud guideline. *See United States v. Johnson*, No. 16-CR-457, 2018 WL 1997975, at *3 (E.D.N.Y. Apr. 27, 2018) (Garaufis, J.) (imposing 24-month sentence despite GSR of 87-108 months, and observing, "[a]s far as this court can tell, the Sentencing Commission's loss-enhancement numbers ***do not result from any reasoned determination of how the punishment can best fit the crime, nor any approximation of the moral seriousness of***

***the crime***" (emphasis added)); *Gupta*, 904 F. Supp. 2d at 355 (varying downward from GSR of 78-97 months to impose 24-month sentence); *United States v. Adelson*, 441 F. Supp. 2d 506, 512 (S.D.N.Y. 2006) (noting "***the utter travesty of justice that sometimes results from the guidelines' fetish with abstract arithmetic, as well as the harm that guideline calculations can visit on human beings if not cabined by common sense***" (emphasis added)); *United States v. Herink*, No. 10-CR-169, 2012 WL 3112002, at *7 (D. Neb. July 30, 2012) (imposing sentence of 18 months despite GSR of 51-63 months and explaining that "because the fraud offense Guidelines were promulgated pursuant to Congressional directive rather than by application of the Sentencing Commission's unique area of expertise, the court afford[ed] them less deference than it would to empirically-grounded Guidelines"); *see also* Mark H. Allenbaugh, *"Drawn from Nowhere": A Review of the U.S. Sentencing Commission's White-Collar Sentencing Guidelines and Loss Data*, 26 Fed. Sent'g Rep. 19, 23 (2013) ("It appears that in practice, loss has very little correlation to the ultimate sentence imposed, regardless of how it determines the advisory guideline range."). In short: "where . . . the calculations under the guidelines have so run amok that they are patently absurd on their face, a Court is forced to place greater reliance on the more general considerations set forth in section 3553(a), as carefully applied to the particular circumstances of the case and of the human being who will bear the consequences." *Adelson*, 441 F. Supp. 2d at 515. The defense submits that, for these reasons, the Court can and should disregard the loss-driven GSR and impose an individualized sentence based on the particular facts and circumstances of this case.

iii. The fraud guideline significantly overstates the seriousness of Bryan's offense in light of the specific circumstances of this case

Even if, contrary to the authorities cited above, the Court agrees with the policy

underlying the fraud guideline and its loss table (and finds that all losses resulting from the conspiracy were reasonably foreseeable to Bryan), the defense respectfully suggests that application of the guideline to raise Bryan's total offense level ("TOL") by 12 would be inappropriate in the circumstances of this case. Even accepting *arguendo* the government position regarding all other guideline-related issues, removing the 12-level loss enhancement would yield a TOL of 9 and a GSR of 4-10 months. Imposing a nearly three-year incarcerative sentence based so heavily on the total loss attributable to the conspiracy would "substantially overstate[] the seriousness" of Bryan's offense, U.S.S.G. § 2B1.1, application notes (providing that downward departure may be warranted on this basis), especially in light of Bryan's relatively limited role in the conspiracy and the lack of evidence that he shared in any of the illicit profits. *See United States v. Watt*, 707 F. Supp. 2d 149, 155 (D. Mass. 2010) (noting that loss may not be an "appropriate proxy" for culpability where the defendant "made nothing from the scheme"); *Herink*, 2012 WL 3112002, at *7 ("[T]here is no evidence that [the defendant] profited from his fraudulent acts, and that fact tempers his culpability to some degree.").

b. *Minimal role*

The defense additionally contends that Bryan is entitled to a 4-level downward adjustment, pursuant to U.S.S.G. § 3B1.2, as a "minimal participant" in the conspiracy. The facts recited in the PSR, connecting Bryan (even indirectly) to only a handful of victims and a small fraction of the stolen money, reflect his "lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others." § 3B1.2, application notes.

The guideline application notes explain that this adjustment is intended to apply to "a defendant who plays a part in committing the offense that makes him substantially less culpable

than the average participant in the criminal activity." *Id.* This assessment may include consideration of uncharged co-conspirators, as well as co-defendants. *See, e.g.*, *United States v. Nkome*, 987 F.3d 1262, 1270 (10th Cir. 2021); Dkt. 84 at 4 (acknowledging that relevant comparators should include "the unidentified individual who made calls to the victims"). The inquiry is "notoriously fact-specific," and, accordingly, "battles over a defendant's status . . . will almost always be won or lost in the district court." *Arias-Mercedes*, 901 F.3d at 5 (citation omitted).

As compared to the average participant in the scheme at issue here, the defense contends that Bryan is "plainly among the least culpable." U.S.S.G. § 3B1.2, application notes. Bryan was a courier, assigned to bring envelopes from one location to another. *See, e.g.*, *United States v. Valdes-Bretones*, 68 F.3d 455, at *2 (1st Cir. 1995) (unpublished) (acknowledging that a "typical courier" possesses "little knowledge and understanding of the nature and scope of the criminal activity"); *United States v. Leiskunas*, 656 F.3d 732, 739 (7th Cir. 2011) (referring to "the wealth of cases where drug couriers receive the benefit of the adjustment, even though their role is necessary to the drug distribution"); *United States v. Troche*, No. 01-CR-274, 2003 WL 223468, at *2 (S.D.N.Y. Jan. 31, 2003) (applying 4-level adjustment to defendant "courier who did not devise the scheme").[9] There is no suggestion, even in the recent government Opposition, that he participated in any respect "in planning or organizing the criminal activity" or exercised any "decision-making authority" whatsoever. *See* § 3B1.2, application notes (listing relevant

---

[9] While drug couriers are not "automatically" entitled to a downward adjustment, *United States v. Ruiz*, 999 F.3d 742, 750 (1st Cir. 2021), Bryan's role in the present case warrants such an adjustment for all the reasons set forth *infra*. Moreover, Bryan did not carry drugs or any other form of contraband. Unlike transporting illegal drugs, there is nothing inherently or obviously nefarious or illegal about picking up and delivering an envelope containing cash.

factors). To the contrary, he simply followed instructions regarding where to go and when. Bryan is, for all of these reasons, indisputably less culpable than those uncharged individuals responsible for setting this scheme in motion and directing its operation. *See* Dkt. 62 at 1-2 (government sentencing memo explaining that "[t]he highest level is the leaders and organizers who, using carefully scripted stories designed to appeal to elderly victims' desires to help their loved ones, place the calls and convince the elderly that a loved one is in legal peril requiring cash assistance").

Bryan is also substantially less culpable than each of his two co-defendants in this case. Both co-defendants admitted in their plea agreements that they "willfully and intentionally 'remained blind' as to the method the conspiracy was employing to cause the elderly victims to provide the cash but generally understood the criminal nature of the conspiracy." Dkt. 53 ¶ 4a; Dkt. 55 ¶ 4a. This admission is conspicuously absent from Bryan's plea agreement. Bryan interacted directly with only a single victim, and there is no evidence that he made or directed any of the false statements that caused the victims to part with their money. His co-defendants, by contrast, pled guilty to meeting with elderly victims, "with the intent to obtain cash generated by the conspiracy through fraud," in five and six different towns, respectively. *See* Dkt. 53 ¶ 4b; Dkt. 55 ¶ 4b; *see also* Nov. 21, 2022 Tr. 11-12 (government arguing at Hatcher's sentencing that "he went to numerous of these senior citizens' houses, looked them in the eye, had them hand over the cash. He could see how desperate they were to help typically their grandchild and how worried they were and just took their money and drove away"). The benefit Bryan stood to obtain similarly weighs in favor of a minimal role. He did not have any "proprietary interest in the criminal activity," and there is no evidence that he shared in any of the ill-gotten profits.

U.S.S.G. § 3B1.2, application notes. Bryan's co-defendants, by contrast, pled guilty to taking a "share of the cash." Dkt. 53 ¶ 4c; Dkt. 55 ¶ 4c. To the extent that Bryan, contrary to the argument *supra* II.a.i, is held accountable for the full loss amount attributable to the conspiracy as a whole, that provides all the more reason for downward adjustment on this basis. *See* § 3B1.2, application notes (citing as example of possible adjustment "a defendant who is accountable under § 1B1.3 for a loss amount under § 2B1.1 . . . that greatly exceeds the defendant's personal gain from a fraud offense or who had limited knowledge of the scope of the scheme").

Alternatively, even if the Court determines that Bryan is not entitled to a 4-level adjustment for a minimal role, he is at least entitled to the 2-level adjustment applicable to minor participants. *See, e.g.*, U.S.S.G. § 3B1.2, application notes (defining minor participant as one "less culpable than most other participants in the criminal activity, but whose role could not be described as minimal"); *United States v. Santos*, 357 F.3d 136, 143 (1st Cir. 2004) (affirming application of minor role adjustment for drug courier who also "inspected the cocaine for quality and assisted in repackaging it for transportation"); *United States v. Vicari*, 228 F. App'x 593, 597 (6th Cir. 2007) (unpublished) (affirming finding that defendant who acted as "a money courier" and "driver" in a drug trafficking conspiracy was a minor (but not minimal) participant).[10]

---

[10] The cases cited by the government upholding "the denial of mitigating role adjustments" are unsurprising given the heavy deference afforded to district courts on this issue. *See, e.g.*, *Arias-Mercedes*, 901 F.3d at 5. Of course, a holding that the district court was not required to grant a downward adjustment does not necessarily mean that the court lacked discretion to grant such an adjustment if it chose to do so. In any event, the cited cases are all readily distinguishable on their facts. *See id.* at 8 (noting that defendant "exercised a modicum of decisionmaking authority in steering and navigating the vessel" and "was paid handsomely"); *United States v. De la Cruz-Gutierrez*, 881 F.3d 221, 227 (1st Cir. 2018) (defendant was one of three participants, all of

In arguing to the contrary, the government characterizes Bryan as playing "an essential role" in the conspiracy. Dkt. 84 at 1. This is a stretch. While Bryan admits to having served as a courier, there is no allegation that he brought any special knowledge or skills to the table. To the contrary, he was easily replaceable. In any event, the government's contention regarding Bryan's "essential role" is expressly not sufficient to preclude a downward adjustment. *See* U.S.S.G. § 3B1.2, application notes ("The fact that a defendant performs an essential or indispensable role in the criminal activity is not determinative. Such a defendant may receive an adjustment under this guideline if he or she is substantially less culpable than the average participant in the criminal activity.").

Turning to the more pertinent issue of relative culpability, the government resorts to just

---

whom "took turns 'navigating'" and "partook in steering" a "small vessel" containing "more than $10,000,000-worth of cocaine"); *United States v. Cortez-Vergara*, 873 F.3d 390, 393 (1st Cir. 2017) (noting that defendant "helped steer the vessel and . . . was one of just three crew members who, by themselves, and otherwise unsupervised, moved a large quantity of drugs hundreds of miles"); *United States v. Melendez-Rivera*, 782 F.3d 26, 29 (1st Cir. 2015) (describing defendant as "present for the planning of the scheme and deeply involved in its execution"); *United States v. Vargas*, 560 F.3d 45, 47 (1st Cir. 2009) (involving defendant "who owned . . . and was driving" truck with "a hidden compartment, in which approximately thirty kilograms of cocaine were secreted"); *United States v. Rodriguez De Varon*, 175 F.3d 930, 946 (11th Cir. 1999) (noting that defendant personally imported "512.4 grams of 85 percent pure heroin" and "furnished $1000 of her own money to finance the smuggling enterprise"). Finally, in several of the foregoing cases, the courts specifically noted that the defendant was being sentenced only for conduct in which he or she personally participated. *See Arias-Mercedes*, 901 F.3d at 7 ("The defendant's base offense level was determined by reference to the specific drug quantity involved in that singular transport—not the amount trafficked through any broader conspiracy."); *Rodriguez De Varon*, 175 F.3d at 942 (explaining that adjustment may be denied "when a drug courier's relevant conduct is limited to her own act of importation"); *Vargas*, 560 F.3d at 49 (involving defendant who was held "responsible for only the drugs actually transported in his truck (as opposed to the more sizable quantities distributed by the conspiracy as a whole)"). Here, by contrast, the government seeks to hold Bryan responsible for the full amount of intended loss attributable to the conspiracy, much of which he indisputably had no personal involvement in.

the sort of "speculation and surmise" that it correctly states should not be considered in determining a defendant's role in the offense. Dkt. 84 at 3 (citation omitted). For one thing, the government asserts that Bryan "coordinated the money pickups with a co-defendant," presumably Alarcon. *Id.* at 1-2. There is no indication in the PSR that Bryan "coordinated" any pick-ups.[11] In fact, as the government elsewhere concedes, he merely followed "instructions" as to where to go and when. *Id.* at 5. Acknowledging, as it must, that Bryan's co-defendants went to many more victims' homes than he did, the government speculates that "[i]t appears [Bryan] was not the one who typically went to the victims' houses because doing so would have exposed him to greater risk." *Id.* at 6. But there is no evidence to support that suggestion. The government also contends that Bryan traveled from Rhode Island to New Jersey on June 8 and June 10, "strongly suggest[ing] that he was responsible for transporting the fraud proceeds" between those states. *Id.* at 8. The PSR references only one of these alleged trips, notably suggesting that Alarcon made the trip that same day (and thereby undermining the inference that the government seeks to draw from Bryan's travel). *See* PSR ¶ 14. In fact, the PSR specifically says that Bryan "spent the night of June 10, 2021, in the greater Providence area." ¶ 22. Moreover, it bears repeating that Bryan lived in New Jersey. The government's interpretation of his alleged travel is therefore far from the "only plausible" one. Dkt. 84 at 8.

The government also relies on an eleven-second video of Bryan opening envelopes containing cash. The defense does not dispute that Bryan obtained such envelopes. Indeed, he pled guilty to doing so. But that fact does nothing to prove that he acted as anything more than a

[11] The defense objects, just as it did with respect to loss attribution, to the government's reliance upon extra-record evidence to contest Bryan's entitlement to a downward adjustment.

mere courier, with little understanding of "the scope and structure of the criminal activity," absolutely no role "in planning or organizing" such activity or "decision-making authority or influence[]," and no "proprietary interest" whatsoever in the fraudulent scheme. *See* U.S.S.G. § 3B1.2, application notes. Additionally, as Bryan explained at his Rule 11 hearing, until he went to the home of the sole victim he interacted directly with, he did not know that the cash was obtained from elderly victims. *See* July 5, 2022 Tr. 18. This further distinguishes Bryan's culpability from that of his two co-defendants who repeatedly met with the elderly targets of the fraud before being apprehended.[12]

c. *Number of victims*

In order for a 2-level enhancement to apply under U.S.S.G. § 2B1.1(b)(2)(A)(i), the government must prove, by a preponderance of the evidence, "that 10 or more victims suffered ***actual loss***." *United States v. Sharapka*, 526 F.3d 58, 61 (1st Cir. 2008) (emphasis added); *see also* § 2B1.1, application notes (defining "[v]ictim" to mean "any person who sustained any part of the actual loss," with no reference to intended loss). Here, the PSR's description of offense conduct includes the circumstances of a pecuniary loss to seven individuals: SS, WH, SH, JK, GT, TB, and MS. Beyond these seven people, the only others identified as "victims of this

[12] The video similarly fails to support the government's argument regarding loss attribution to Bryan. Crediting the assertions in the government Opposition, three of the five envelopes contained $4,000, $2,000, and $7,500 in cash, respectively (with two other envelopes containing an unknown quantity). *See* Dkt. 84 at 6. The video appears, based on the discovery received by the defense, to have been taken on the afternoon of June 10 (the government Opposition is inconsistent on this point, first dating the video June 11 and subsequently June 10, *see id.* at 6, 8). The PSR reflects only three successful pick-ups by Bryan's alleged co-conspirators on June 10 or before, and none of those match the amounts that the government says were contained in the envelopes. *See* PSR ¶ 15 ($16,000 from SS), ¶ 18 ($9,500 from WH), ¶ 19 ($13,700 from WH).

offense" in the revised PSR are four victims of unsuccessful attempted thefts, CB, EM, MM, and AT. *See* PSR ¶ 33 n.2, ¶ 39. Probation concluded that three other individuals, LL, JJ, and TK, "although identified as victims by the government, were not included in the offense." ¶ 39.

The foregoing appears to reflect probation's agreement that the government has failed to prove that 10 or more victims suffered an actual loss. In arguing to the contrary, the government maintains that LL, JJ, and TK are cognizable victims. But none of those three individuals is even mentioned in the description of offense conduct, precluding any finding that their claimed loss resulted from Bryan's offense. The problem is not, as the government frames it, that these individuals did not "submit[] declaration of loss forms." Dkt. 84 at 11. Rather, the government has failed to provide evidence regarding the circumstances of any actual loss suffered. The government bore the burden of proof on this issue, and it is simply not enough at this stage to rely on unspecified "interviews of these individuals, telephone records and bank records." *Id.* at 12.

Even assuming, contrary to the foregoing, the Court finds that the conspiracy did involve 10 victims, Bryan was shown to have personally interacted with only one victim (who is not even counted for present purposes because the unsuccessful attempt did not result in an "actual loss," *see* Dkt. 84 at 11 n.1), and is only mentioned by the PSR at all in connection with two other victims. Accordingly, there is no proof by a preponderance of the evidence that the involvement of 10 victims was reasonably foreseeable to him, as required by the guideline. *See, e.g.*, *United States v. Diaz-Correa*, 287 F. App'x 899, 901 (1st Cir. 2008) (unpublished).

Nearly a month after the defense objected to the 2-level enhancement for the number of victims, the government objected to probation's initial decision not to apply the 4-level

enhancement under U.S.S.G. § 2B1.1(b)(2)(B), which requires proof of a "substantial financial hardship to five or more victims." *See* Dkt. 87-3. The current PSR applies this 4-level enhancement instead of the prior 2-level one. As an initial matter, it is worth noting that this enhancement was not applied to Hatcher, *see* Nov. 21, 2022 Tr. 3, notwithstanding the fact that he interacted with far more victims than Bryan and took money directly from two of the specific victims cited by the government with respect to this enhancement. *See* PSR ¶ 25 (involving JK), ¶ 32 (involving MS).

One of the five victims that the government cites in support of this enhancement, SN, is not mentioned at all in the current version of the PSR. The prior version had simply identified her as someone owed restitution "[a]ccording to the government," without any support or factual description of the claimed loss. Dkt. 63 ¶ 101. There is no proof by a preponderance of the evidence that SN was a victim of Bryan's offense conduct, much less a reasonably foreseeable one.

The government has not satisfied its burden to produce evidence that five victims satisfy the guideline's definition of "***substantial*** financial hardship." (Emphasis added). Of course, each and every one of these victims suffered a tragic and unwarranted hardship. That is the very nature of a financial fraud offense, and the defense does not seek to minimize or in any way depreciate the gravity of the offense at issue here. But this enhancement requires more. *See* U.S.S.G. § 2B1.1, application notes (citing relevant factors). It entails inquiry into the victims' individual circumstances to determine whether the loss was substantial to the particular victim at issue. *See United States v. Kitts*, 27 F.4th 777, 790 (1st Cir. 2022). This should preclude consideration of one victim relied upon by the PSR for purposes of this enhancement, TB, who

does not appear to have provided any information beyond checking the box on the loss declaration form for "substantial loss of a retirement, education, or other savings or investment fund." *See* Dkt. 63-3 at 3. While the other victims cited by the PSR on this issue appear to satisfy at least one of the factors set forth in the application notes, the enhancement requires five victims suffering a substantial financial hardship. It also bears repeating that Bryan did not interact with any of these victims and that the vast majority of the losses sustained by WH and SH resulted from conduct different in kind than that which Bryan agreed to participate in and were incurred after his arrest, which should, in and of itself, preclude attribution to him.

## III. A Sentence of Probation Would Be Fair, Just, and Sufficient to Meet the Sentencing Goals Set Forth in 18 U.S.C. § 3553(a)

As in all sentencing proceedings, this Court is tasked with imposing a punishment that is "sufficient, but ***not greater than necessary***" to serve the enumerated statutory goals. 18 U.S.C. § 3553(a) (emphasis added). Among other things, the Court should consider the nature and extent of the defendant's particular role in the offense; what, if any, punishment has already been inflicted upon him; his individual circumstances; sentences imposed and to be imposed on his co-conspirators; and the likelihood of recidivist behavior. In the circumstances of the present case, the defense respectfully submits that a sentence of probation is "sufficient, but not greater than necessary" to serve § 3553(a)'s sentencing goals.

a. *History and characteristics of the defendant*

Prior and subsequent to the five-day period giving rise to the instant case, Bryan has led a decent and law-abiding life. His only prior contact with the criminal justice system was a guilty plea to swimming in a prohibited area at the age of 18, and a dismissed charge for failing to attend school.

As set forth *supra* I, Bryan has proven himself to be a hard-working individual, willing to take on responsibilities far beyond those of a typical person his age to support his family, more specifically his mother. In high school, when most students are focused on achieving good grades and participating in extracurricular activities, Bryan needed to earn money so that his family could have a place to live, food, and electricity. It is noteworthy that, in these difficult circumstances, Bryan did not turn to a life of crime. Instead, he engaged in honest pursuits like cutting hair, real estate, and securities trading.

b. *Circumstances of offense*

Bryan does not dispute, because he cannot, the gravity of the crime that he participated in. But the defense does contend that a careful examination of the circumstances of Bryan's role reflects certain factors that the Court can consider in mitigating his individual culpability.

For a period of five days, June 7 to 11, 2021, Bryan allowed himself to (unwittingly at first) become involved in this unlawful and fraudulent scheme. He was recruited by someone he did not know to serve as a courier picking up and delivering packages, in exchange for a fixed payment. *See* Def. Objs. to PSR ¶ 12. Bryan seized on the opportunity to generate income. His judgment was, perhaps understandably, clouded by a desire to provide for his mother.

As explained in detail *supra* II.b, Bryan had no role in planning or organizing the criminal activity, and no proprietary interest in it. Instead, he served as a courier, following instructions from unidentified individuals to pick-up packages in one location and deliver them to another. *See* Def. Objs. to PSR ¶ 19. At some point, Bryan became aware that the envelopes he was picking up contained stolen money and, to his great regret, he continued to participate. Bryan was apprehended after arriving at one victim's home. Notably, this was the first time that

Bryan had interacted directly with a victim, and it was the first time he realized that the scheme was directed at the elderly. *See* July 5, 2022 Tr. 18.

c. *Disparities among defendants*

Section 3553(a)(6) specifically directs sentencing judges to consider "the need to avoid unwarranted sentence disparities among defendants . . . who have been found guilty of similar conduct." *See also United States v. Robles-Alvarez*, 874 F.3d 46, 52 (1st Cir. 2017) (explaining that this subsection is "primarily aimed at national disparities," but "also permits consideration of disparities among co-defendants" (citation omitted)).

Here, this Court sentenced Bryan's co-defendant Jason Hatcher to 9 months' incarceration for his participation in the wire fraud scheme to which Bryan pled guilty, and a 24-month consecutive sentence for aggravated identity theft. *See* Dkt. 75. The other co-defendant, Diego Alarcon, was also charged with aggravated identity theft, *see* Dkt. 15 ¶ 28, eventually entering into a binding plea carrying a sentence of 24-33 months' incarceration, *see* Dkt. 55 ¶ 2a. Bryan, by contrast, was never charged with aggravated identity theft. The aggravated identity theft statute ***requires*** a minimum two-year term consecutive to any sentence imposed on other counts. *See* 18 U.S.C. § 1028A(b)(2). This statutory structure clearly reflects Congress's view that aggravated identity theft entails a distinct harm, above and beyond commission of the underlying predicate offense. In fact, the statute expressly prohibits courts from reducing the defendant's sentence on the predicate felony "to compensate for, or otherwise take into account" the consecutive sentence for aggravated identity theft. § 1028A(b)(3).

In light of the foregoing, the relevant comparator for present purposes is Hatcher's 9-month sentence for wire fraud. As explained in detail *supra* 16-17, Hatcher's involvement in the

fraudulent scheme was far more extensive than Bryan's. Hatcher also had 6 criminal history points, plus an additional 2 points for having committed the instant offense while on probation, placing him in criminal history category IV. *See* Nov. 21, 2022 Tr. 3-4. While the defense is not privy to the details of Hatcher's record, the government represented that he had "at least two serious prior convictions for guns and drug distribution," adding that Hatcher "has basically engaged in one criminal activity after the next for the last several years." *Id.* at 16. Bryan, by contrast, has no significant criminal history. *See* PSR ¶ 57 (reflecting 0 criminal history points). Accordingly, the defense respectfully submits that a sentence significantly below 9 months, for example probation, is necessary to avoid unwarranted sentencing disparity. The government's recommended sentence of 33 months, the very same term of imprisonment it recommended for Hatcher on both wire fraud and aggravated identity theft combined, should be rejected.

d. *Specific and general deterrence*

Bryan's lack of any significant criminal history suggests there is little need for specific deterrence in this case. "Minimal or no prior involvement with the criminal justice system is a powerful predictor of a reduced likelihood of recidivism." *United States v. Germosen*, 473 F. Supp. 2d 221, 227 (D. Mass. 2007). The defense submits that Bryan's behavior over the vast majority of his young life further undermines the need for specific deterrence. His five-day involvement in this unlawful conduct, regrettable though it was, stands as a clear aberration as compared to Bryan's years of hard work to lawfully support his family.

The goal of general deterrence similarly does not require incarceration. Bryan, who gained nothing financially or otherwise from his offense, is virtually certain to pay a heavy price. He has spent about eighteen months living under the significant strain of federal indictment and

conditions of release. Additionally, Bryan faces the very real prospect of possible deportation, separating him from his mother who depends upon Bryan for daily support.[13] In short, no rational human being aware of Bryan's situation would ever knowingly and intentionally choose to endure what he has and will likely continue to experience as a result of his conduct in this case.

The government's suggestion to the contrary wrongly equates Bryan with the leaders of the illegal "organization," none of whom stand before this Court. Regardless of whether or not such leaders might "monitor[] the outcome of the criminal cases brought against [the organization's] workers," there is no indication that they will be deterred by punishment levied upon interchangeable couriers. Dkt. 62 at 7. Nor is there any indication that the prospective couriers themselves, similarly situated to Bryan, have any insight into the larger operation of the scheme, much less knowledge of criminal sentences imposed in prior cases.

**IV. Bryan Should Not Be Held Liable for the Full Amount of Restitution**

The mandatory restitution statute defines "victim" as "a person directly and proximately harmed as a result of the commission of an offense . . . including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or

[13] The Court plainly has the ability to consider these collateral consequences in fashioning an appropriate sentence. *See United States v. Stewart*, 590 F.3d 93, 141 (2d Cir. 2009) ("It is difficult to see how a court can properly calibrate a 'just punishment' if it does not consider the collateral effects of a particular sentence."); *United States v. Nesbeth*, 188 F. Supp. 3d 179, 180 (E.D.N.Y. 2016) (varying from guidelines to impose non-incarcerative sentence "in part because of a number of statutory and regulatory collateral consequences [the defendant] will face as a convicted felon"). Indeed, "a sentencing court has the discretion, in an appropriate case, to weigh the possibility of future deportation when mulling the section 3553(a) factors . . . ." *United States v. Hercules*, 947 F.3d 3, 9 (1st Cir. 2020).

pattern." 18 U.S.C. § 3663A(a)(2). Here, the only victim who Bryan interacted with has already presumably had her property returned. Bryan was apprehended "attempting to collect" money from her. PSR ¶ 33. This victim did not suffer an actual loss compensable as restitution. *See, e.g., Innarelli*, 524 F.3d at 294 ("[R]estitution under the MVRA is intended to compensate the victim for losses actually suffered as a result of the defendant's crime"). After a defense objection, probation removed from the PSR's restitution section four victims of unsuccessful attempts accounting for $39,500 in intended loss. *See* PSR ¶ 101 (omitting reference to CB, EM, MM, and AT), ¶ 33 n.2 (providing intended loss for each of foregoing attempts). The only actual losses in which the PSR personally implicates Bryan, even tangentially, are $9,500 that Alarcon took from WH and then "handed off" to Bryan, and $15,500 that Alarcon took from SH in a Harbor One Bank envelope (an envelope from that bank was later found in Bryan's car). *See* ¶¶ 19, 23. The restitution statute facially does not render Bryan responsible for losses sustained by other victims of the conspiracy because there has been no showing whatsoever that those victims were "directly harmed by ***the defendant's*** criminal conduct." § 3663A(a)(2) (emphasis added). For reasons set forth *supra* II.a.i, the government has not satisfied its burden of proving that such losses were "reasonably foreseeable" to Bryan. *See, e.g., United States v. Solis-Vasquez,* 10 F.4th 59, 63 (1st Cir. 2021) (citation omitted).

Following the defense objection, probation also removed from the list of victims owed restitution three individuals who, "although identified as victims by the government, were not included in the offense." PSR ¶ 102. These individuals, LL, JJ, and TK, account for $55,800 in loss. *See* Dkt. 63 ¶ 100. Another victim from the prior version of the PSR, L/SN, is no longer

mentioned in the current document, accounting for an additional $21,000 loss. *See* Dkt. 63 ¶ 101. On this record, these individuals must be excluded from the restitution calculation. In fact, the description of offense conduct fails to mention any of them.

The revised restitution figure put forward by probation, $341,081, *see* Dkt. 87-1 ¶ 6, is tens of thousands of dollars more than the sum of the amounts reflected in the relevant PSR paragraph. *See* PSR ¶ 103 (adding up to $268,756). The higher number appears to include amounts for the three individuals expressly found not to be "included in the offense." *Id.* ¶ 102. This is contrary to Supreme Court precedent limiting restitution to "the loss caused by the specific conduct that is the basis of the offense of conviction." *Hughey v. United States*, 495 U.S. 411, 413 (1990). For similar reasons, losses identified above as having resulted from different types of fraudulent conduct occurring outside the temporal scope of the conspiracy to which Bryan pled guilty should be excluded from any restitution award as to him. *See supra* 9-10; *Solis*, 10 F.4th at 63 (providing that losses must be reasonably foreseeable and occur "in the course of the conspiracy" (citation omitted)).

Even assuming *arguendo*, and contrary to the above, that the Court finds Bryan potentially liable for the full amount of restitution, it should nonetheless exercise its discretion to "apportion liability . . . to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h). As set forth above, the defense contends that Bryan was substantially less culpable than either of his two co-defendants in the conspiracy at issue. Of particular pertinence here, both co-defendants admitted in their plea agreements to taking a "share of the cash." Dkt. 53 ¶ 4c; Dkt. 55 ¶ 4c. There is, by contrast, no hint in the PSR or elsewhere that Bryan retained a single penny of the ill-gotten money.

Additionally, Bryan's economic circumstances render the prospect of full restitution, or anything approaching it, highly unrealistic, even over an extended timeframe. While Bryan is working to advance his career, his current income is barely sufficient to cover basic necessities for himself and his mother.

## V. Conclusion

For the vast majority of his 23 years, Bryan has led a good, upstanding life. He has worked hard to support his family, taking on responsibilities far beyond those of a typical person his age, and gone out of his way to help those in need even in the midst of personally difficult circumstances and with nothing at all to gain for doing so. For a tiny fraction of his life, spanning just five days, Bryan allowed himself to be pulled into a criminal conspiracy that he did not set in motion or oversee. With the hope of earning money to help support himself and his mother, Bryan traveled to Rhode Island for what he believed was a courier job. In the ensuing days, Bryan discovered that the packages he had been tasked with picking up and delivering contained cash and that he had become embroiled in a fraudulent scheme. While he did not know the details of the conspiracy, Bryan failed to do what was morally right and legally required in that moment. He did not extricate himself from the situation and refuse to participate further. That five-day lapse in judgment, however, should not outweigh the thousands of days that Bryan has spent doing everything right. He is an intelligent, hard-working, and empathetic young man, who could be an asset to his community in the years and decades to come. For all of the foregoing reasons, the defense respectfully requests a sentence of probation.

Respectfully Submitted,
BRYAN VALDEZ-ESPINOSA

By His Attorneys,

**/s/ Michael Pabian**
Michael Pabian, Esq.
*Admitted pro hac vice*
20 Park Plaza, Suite 1000
Boston, MA 02116
(617) 227-3700
pabianlaw38@gmail.com

**/s/ Anthony M. Traini**
Anthony M. Traini, Esq.
117 Metro Center Boulevard – Suite 2001
Warwick, RI 02886-1774
(401) 621-4700
amt@atrainilaw.com

Dated: February 9, 2023

**CERTIFICATE OF SERVICE**

I, Michael Pabian, hereby certify that on this date, February 9, 2023, a copy of the foregoing document has been served via Electronic Court Filing system on all registered participants.

**/s/ Michael Pabian**
Michael Pabian, Esq.