IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

- - - - - - - - - - - - - - - -X

| | |
|---|---|
| UNITED STATES OF AMERICA, | : 21-cr-00071(WES) |
| vs. | : United States Courthouse<br>: Providence, Rhode Island |
| BRYAN VALDEZ-ESPINOSA,<br>Defendant. | : Monday, February 13, 2023 |

- - - - - - - - - - - - - - - -X

TRANSCRIPT OF CRIMINAL CAUSE FOR SENTENCING
BEFORE THE HONORABLE WILLIAM E. SMITH
UNITED STATES DISTRICT COURT JUDGE
COURTROOM 3

A P P E A R A N C E S:

For the Government: LEE H. VILKER, AUSA
U.S. Attorney's Office
50 Kennedy Plaza
Providence, RI 02903

For the Defendant: MICHAEL PABIAN, ESQ.
Michael Pabian Law Office, LLC
20 Park Plaza, Suite 1000
Boston, MA 02116

Court Reporter: Lisa Schwam, CRR-RPR-RMR
One Exchange Terrace
Providence, RI 02903

13 February 2023; 10:35 a.m.

THE COURT: All right. Good morning, everyone. We're here in the matter of the United States vs. Bryan Valdez-Espinosa. We're here for sentencing today. Let's have counsel identify themselves for the record.

MR. VILKER: Yes. Good morning, your Honor. Lee Vilker for the United States along with Special Agent Jodie Donaghy from HSI.

MR. PABIAN: Michael Pabian on behalf of Bryan Valdez.

THE COURT: Okay. Thank you very much. So I have the presentence investigation report that was prepared by the Office of Probation in this matter.

Mr. Pabian, if you would just confirm on the record that you've had the opportunity to review the report with your client and that you've been able to answer all of his questions.

MR. PABIAN: Yes, I have, your Honor.

THE COURT: All right. Now, there are a number of objections to the presentence report, and it probably makes sense for us to deal with those objections first and then, once we do that, I'll be able to set forth the advisory guideline range more accurately.

So some of these may have already been resolved

and some I think are prepared to be resolved now, but there are a couple that seem fairly substantial to me, so I think I will take them in the orders they're listed at the end of the presentence report. And if they're not resolved, then I'll hear argument on them and try to make a determination.

So I am on the addendum to the presentence report. The first objection listed there on page 2 relates to the defendant's high school diploma. Ms. Picozzi informed me that she finally did receive confirmation of that, so that objection is sustained, essentially, and the PSR will be revised accordingly.

The second objection to paragraph 6 is to the statement that defendant having prior knowledge of the cash being obtained from elderly victims. This was taken from the plea agreement as I understand it, so I think the defendant agreed to this as part of the plea; isn't that right?

MR. PABIAN: Your Honor, the plea agreement language could be read to imply that. The elderly victims occurs at the end of a long sentence saying what he agreed to. But we would just submit that his statements under oath in court at the plea hearing where he said that he did not, in fact, know that these were elderly victims until the very end when he arrived

at one victim's house, we submit that that speaks far more clearly to the issue in the plea agreement and we'd say that that takes precedence.

THE COURT: All right. Well, I want to hear more about that contention, but I don't think that the objection is consistent with what he admitted to -- conduct he admitted to in the plea agreement, so I'm going to deny the objection to that statement in paragraph 6.

Next is to paragraph 45. Now, this is the objection to the 12-level increase associated with the amount of loss. So I can hear you on that, but I guess the question there is, as the probation officer has put in her response, the amount of loss of the full conspiracy is the attempted effort to procure $350,715. And I guess the question is, why wouldn't this defendant be accountable under 2B1.1(b)(1)(G)?

So do you want to speak? You can come up and argue and then I'll hear from Mr. Vilker.

MR. PABIAN: Yes, your Honor. Thank you.

So as I'm sure your Honor is aware, the touchstone here is reasonable foreseeability. It's blackletter law that it's simply not enough for a defendant to have joined in a conspiracy that caused a certain amount of loss. In order to attribute that

loss to him for sentencing purposes, it must have been reasonably foreseeable to him.

And as I read the case law, there are essentially two ways in which in other cases the government has gone about doing this. First, the government could show that Bryan was so involved in the, quote/unquote, "inner workings" of the conspiracy that the full scope of the operation was foreseeable to him. We submit that in this case, the government has not come close to making such a showing. By their own account and their most recent submission, what Bryan did was essentially follow instructions to pick up envelopes at one location and deliver them to another. There was no showing whatsoever that he was playing any sort of major role in this conspiracy or, frankly, that he was even directly involved in the vast majority of these transactions.

So absent evidence of that type of high-level involvement in the scheme, we submit that the government should be required to individually connect the claim losses to Bryan. And I think if we get to that point, it becomes clear that the government has utterly failed to do that in this case. Even considering the extra record evidence that it relies upon in its most recent brief and finding, contrary to

the defense argument that we've laid out in our memo, that that evidence is sufficient to warrant attribution to Bryan, the government still accounts for less than 20 percent of the total loss in this case. And we submit that for sentencing purposes it can't simply be assumed that the remaining approximately $300,000 was reasonably foreseeable to Bryan here.

The last thing I'd add is that the PSR I think facially makes clear that large portions of this loss amount, upwards of $130,000, stem from conduct in which Bryan had no involvement whatsoever. It wasn't envelopes with cash; it was wires to the Dominican Republic, gift cards that the victims were tricked into purchasing, and that that conduct, or at least the vast majority of it, occurred after Bryan was arrested. So we would submit that at least with respect to those amounts, that was not reasonably foreseeable to Bryan and it should not be included in the loss calculation.

Alternatively, if the Court disagrees with all of that, we'd ask that, for reasons we set forth in our sentencing memo, that it vary downward from the loss-driven guideline range for disagreement with the policy in the fraud guideline or finds that the fraud guideline in this case overstates the seriousness of Bryan's offense because, A, of his relatively low level

of involvement as a courier and, B, because of the lack of evidence that he made even a penny off of this illegal enterprise.

So unless the Court has any questions, I'll rest on my brief.

THE COURT: Well, I think what I'd like to have you do is get these -- these objections all seem a little bit interrelated. It might make sense for you to go ahead and address the two-level versus four-level enhancement for substantial financial hardship because -- for a number of victims and substantial financial hardship, because I'm going to have a bunch of questions for Mr. Vilker and I want to get straight all this business about the various victims because there are some inconsistencies throughout the materials and I'm a little bit confused by that.

So why don't you start by putting your argument on those points on the record and then we'll go from there.

MR. PABIAN: Of course, your Honor.

So I think on both of these enhancements relating to the number of victims, the two level that the prior version of the PSR applied and the four level that is now being applied, we submit that neither is appropriate and in both cases because of a failure of

proof by the government. Probation in its most recent PSR appears to agree that the government has failed to prove that there were ten or more victims of this offense and, in fact, the revised PSR makes a specific finding that three of the victims that the government is relying upon were not victims of this offense.

None of those people are even mentioned in the PSR's description of the offense conduct, and the government hasn't submitted any additional information regarding those victims to prove that they suffered a pecuniary loss as a result of Bryan's offense. And that's their burden of proof on that point.

THE COURT: So just on that point, so the offense conduct describes I think seven victims; is that right?

MR. PABIAN: Yes, that's correct, your Honor.

THE COURT: And you concede those seven victims for purposes of that --

MR. PABIAN: Yes. The only wrinkle there is there's seven victims that suffered a pecuniary loss. There are more where the loss is intended, and I think everyone agrees by now that those victims are not included in the count for the purposes of this enhancement.

THE COURT: So everyone is in agreement that

there are seven who suffered actual pecuniary loss, and then things seem to get a little off or there's a disagreement with respect to these other individuals.

Now, I'm looking at paragraph 39 of the PSR, and here there are the victim impacts so there are declaration-of-loss notices from -- I don't really want to use everyone's full names, I'll just use first names -- Sheila, Terence, William, Jacqueline, Mary, Sandra, correct?

MR. PABIAN: Yes, your Honor. And the only caveat I'd add there is that we do still make a reasonable foreseeability argument with respect to Bryan. But we do agree that the seven there have suffered a pecuniary loss and are victims of this offense.

THE COURT: Now then, the government identifies victims Leonardo, Ruth, Jeffrey and Theresa so four additional victims, but they're not included in the offense conduct. Now, that's your point, right?

MR. PABIAN: Yes. They're simply not mentioned in this document other than to say that the government says they're a victim. And in the government's most recent submission they said certain ways in which they, in their mind, establish them as victims of this offense; but, you know, we haven't seen any of that,

it's not in the record of this sentencing proceeding and at this stage that's just not enough.

THE COURT: Just so I'm understanding clearly what the evidence is and what it isn't, there's no dispute as to the first seven, and then there's the four that the government -- and as to those individuals, there is an agreed-to amount of loss for each of them, you're not disputing that, and they each have a restitution amount associated with them; is that right?

MR. PABIAN: Yes. Again, with the caveat that reasonable foreseeability is a question that we pressed with regard to some of those amounts.

THE COURT: Then there are these additional four people who are not included in the offense conduct. And you're saying there's been no evidence submitted as to any actual pecuniary loss as to those four; is that right?

MR. PABIAN: Or how the loss was suffered; that it was a loss as a result of Bryan's offense. We simply don't know anything about these people other than what it says here in the document which, in our view anyway, falls woefully short of proof by a preponderance of the evidence.

THE COURT: All right. And then finally moving

to your next objection which has to do with the substantial financial hardship. Here we get into the question of whether the guideline definition is met. And I'm sure you have it at the tip of your fingers. Direct me to the guideline --

MR. PABIAN: I actually need to go over to counsel's table for a moment.

(Pause)

MR. PABIAN: Yes. So was your Honor referring to the definition in the application notes of what constitutes substantial financial loss?

THE COURT: I think it's 2B1.1(b)(2).

MR. PABIAN: Yes, you're right, your Honor.

THE COURT: So just one moment.

(Pause)

THE COURT: All right. Now, where is the definition of substantial?

MR. PABIAN: It is Comment 4(F). It's on page 12 of my Westlaw printout towards the top.

THE COURT: All right. So this is the definition that you've referenced.

MR. PABIAN: Yes, your Honor.

THE COURT: It must show that it resulted in a victim becoming insolvent, filing for bankruptcy, suffering substantial loss of a retirement, education

or other savings or investment fund, making substantial changes to his or her employment such as postponing his or her retirement plans, making substantial changes to his or her living arrangements such as relocating to a less expensive home and suffering substantial harm to his or her ability to obtain credit.

Now, it seemed to me that the one that potentially applies to some of the victims who suffered the lower amounts of loss would be Subsection 3, suffering substantial loss of retirement or savings or investment funds.

MR. PABIAN: Yes, your Honor.

THE COURT: Now, even if the amount of loss was $15,000 or 25,000, if somebody only has 50,000 in their bank account, 25,000 is a lot and that's enough to change their life.

So why isn't that sufficient?

MR. PABIAN: Yes, your Honor, I understand. If it's okay with you, I'd like to take a step back and provide a little context here and then get to the question you're asking.

THE COURT: Sure.

MR. PABIAN: I think at the outset it's important to note that this issue was introduced into the case after codefendant Hatcher's sentencing.

Unlike Bryan, codefendant Hatcher took money from two of these victims that the government is now citing in support of this enhancement. So I really -- I'm not sure why it was introduced at this point, but I don't see any principal basis to apply it to Bryan but not to Mr. Hatcher, you know. And it was also raised about a month after the defense challenged the two-level number-of-victims enhancement that we were talking about a moment ago.

I'd also like to note at the outset that we certainly don't question the fact that this crime resulted in an unwarranted financial hardship to each and every single victim, but it's this enhancement that has a specific standard that requires more than that. And I think your Honor's exactly right that this Subsection 3 is really the pertinent one here, and that this is the one that we see cited in the victims' statements and the loss declaration forms.

I think for several of the victims that subsection is at least arguably met, but there are a couple for which, in our view, is clearly not. And because the enhancement requires five victims and the probation-revised PSR relies on only five, I think that the fact that one of these victims essentially just checked the box on the form and that's the only

evidence that we have of a substantial loss, respectfully, we just say that's not enough under the guideline, you know, that that victim suffered a loss of $13,000 which, again, it's an unwarranted hardship that nobody should have suffered because of this type of conduct. But at the same time, $13,000 is one thing to somebody with $20,000 in their bank account; it might be another to somebody with $150,000 in their bank account. And we just simply don't know the answer to that.

And I read the case law and particularly the First Circuit's recent opinion in *Kitts* to require that sort of contextual inquiry about assessing the loss in the context of the particular victim's finances. And there's just no evidence of that so we submit that, for that reason, that particular victim cannot be included in the count and that the enhancement does not apply.

Now, the government does rely on one additional victim, but that victim is somebody who is not even mentioned whatsoever in the most recent PSR. Her name doesn't even appear. So again, similar to the issue we had on the two-level enhancement, there's just no evidence to conclude that that victim suffered a substantial financial hardship as a result of Bryan's offense because we just don't have any information

about the facts and circumstances of that loss.

THE COURT: Okay. Thank you. Let me hear from Mr. Vilker on all this.

MR. PABIAN: Your Honor, would it make sense to address minimal role now?

THE COURT: Yes. Go ahead.

MR. PABIAN: Okay. Thank you, your Honor. And I'm sorry to interrupt.

So I think that the thrust of the government's brief on this issue is that it's our burden and we haven't met it. Now, it's true that it's our burden to establish a minimal or minor role in the offense, but here the facts that we rely on are undisputed in large part. There's no evidence at all that Bryan participated in planning or organizing any aspect of this criminal activity. There's no evidence at all that he exercised decisionmaking authority or influenced the exercise of decisionmaking authority. And there's no evidence that he stood to benefit in any significant way from the criminal activity or had a propriety interest of any kind in it.

So this only leaves two of the Application Note factors, the first being Bryan's understanding of the scope and structure of the criminal activity. As we just discussed in the context of the loss enhancement,

we don't think that there's any proof of that.

And lastly, there's the nature and extent of Bryan's participation. I think the evidence in this case speaks clearly to the fact that Bryan's level of involvement was as a courier and nothing more. That's what he did; picked up envelopes from one place, delivered them to another. And we think that all of these factors in combination renders Bryan significantly less culpable than, A, his codefendants in the case for reasons that we've set forth at length in our memo and, B, and an even more striking comparison, the uncharged individuals who set the scheme in motion and oversaw its operation. There's no indication whatsoever that Bryan played any type of role like that in this offense.

THE COURT: Well, we're probably getting a little bit ahead of ours and you'll have to repeat some of these arguments in your ultimate sentencing argument, but the question in my mind is what, if anything, differentiates Mr. Valdez from the other two defendants, Hatcher and Alarcon. Now, I understand Hatcher had an aggravated identity theft count which changed the calculus with him, but particularly with respect to Alarcon, I mean, I'm not sure I see any difference at all with respect to the role that these

two played. I mean, they seem to have -- you know, they got different assignments. Sometimes they were working together. They both came up to Rhode Island from New Jersey. Both taking orders from the same people.

So is there any difference?

MR. PABIAN: Yes. So I think there's two things I would say. First is the issue of aggravated identity theft which you noted with respect to Mr. Hatcher. That was also an issue for Mr. Alarcon. He was charged with aggravated identity theft. He entered into a binding plea that set a low-level sentence at the minimum term for aggravated identity theft.

So I think that the fact that that count was at play in his case really can't be overlooked as far as comparing the two for sentencing purposes, because that's a very clear area of the law where we have Congress saying it has to be a two-year consecutive sentence and the Court's not even able to consider that two-level mandatory consecutive sentence in setting the sentence on the underlying predicate offense. So it's a very clear statement by Congress in my view that that conduct carries a very significant harm to society that's separate and apart from the underlying offense. So that's one thing.

Secondly, I think that Mr. Hatcher and Mr. Alarcon both admitted in their plea agreements to having met with several of these victims in many different towns, five and six different towns I believe it was. To paraphrase the government at Mr. Hatcher's sentencing, he looked these elderly senior citizens in the eye, he saw the desperation in their eyes to try to help the family member and he took their money. That's something that Bryan simply didn't do. He arrived at one victim's home right before he was apprehended. He never successfully took any money from a senior citizen. And again, with the understanding that the Court overruled our objection to the PSR, he was very clear in his Rule 11 hearing that he did not know that these were elderly victims until that moment.

Unless your Honor has any other questions for me.

THE COURT: No. We'll come back to all of this I think in a little bit. I'll hear from Mr. Vilker.

MR. PABIAN: Thank you, your Honor.

MR. VILKER: Your Honor, I have so much to say in response to that, but the last comment I think is the most fundamental.

THE COURT: I know you want to get to that, but I want to get the guidelines set first, so I want you

to deal with these objections because I'm a little confused by some of this. I want you to get -- so first start with the financial loss.

MR. VILKER: Okay. There's no question that the total amount of actual loss is about 300,000 and the intended loss is 350,000. The defense is correct that the loss has to be foreseeable to a particular defendant for it to be included; you can't just say the total loss is X and therefore you're part of the conspiracy so you're responsible for it. It's a question of reasonable foreseeability.

The facts of this case make it very clear that this, the entire scheme and the entire loss here in Rhode Island, was reasonably foreseeable to this defendant. And you really kind of have to get into the weeds of the facts to understand it.

It is true that he only went to one victim's house and that victim happens to be here in court today, Mary Mountain and her son who took quick action and apprehended this defendant. So at first blush you might think he only went to one person's house, maybe he's not as responsible, maybe he didn't really understand the full scope of the conspiracy, but if you look at the evidence in total, you see that the opposite is true. We believe he was higher up on the

totem pole than the other two defendants who have already been -- one has been sentenced and one is about to be sentenced.

The facts that we know is he rented a vehicle with Mr. Alarcon in New Jersey. They drove up here together. They stayed in the same hotel in Seekonk, as did Mr. Hatcher. They were getting messages, sending each of them out. We know about Ms. Mountain and this defendant appearing here. We know that on the defendant's phone was a video of him examining five envelopes of cash, and that was taken on June 11th of 2021 after five envelopes of cash had been picked up from various victims in this case. He's looking through them, they contain thousands of dollars, and strongly suggesting that it was this defendant's job, in addition to the one house he went to, to be collecting the money that at least Mr. Alarcon was collecting from the other victims and then transporting them back to New Jersey.

This defendant's travel information during the conspiracy I found particularly compelling. He comes up from New Jersey to Rhode Island on June 7th. There's some cash picked up from victims on June 8th. That day -- excuse me, the next day -- excuse me, on June 8th this defendant drives back to New Jersey. He

comes back to Rhode Island on June 9th.

On June 10th, there were additional cash pickups including from Mr. Holtmann that you heard from in the other defendant. Mr. Alarcon takes possession of five envelopes of cash, drives that day to New Jersey at 7:00 p.m., immediately drives -- doesn't even stay in New Jersey for a few minutes, drives straight back to Rhode Island. Very clear what he's doing is he's getting all this cash from the various victims and transporting that cash back to the individual who apparently is the one making these calls in New Jersey, although we're not sure about that.

The cell site information in this case shows exactly what was happening, where these defendants were, and we see time and time again that specifically with Mr. Alarcon, that he would go, he would meet with the victim; you see him at the victim's house in whatever town they're in. Immediately after getting the money, he would go to the area where this defendant was located in downtown Providence. Obviously, cell site you're not going to have -- you can't say with absolute certainty that they're meeting together, but it seems by the pattern very clear that that's what was happening.

And then we see the defendant in a video of all

the envelopes of cash which makes it crystal clear what was happening. We see this defendant having nonstop calls and FaceTime calls and text messages with Mr. Alarcon both before and after Mr. Alarcon is meeting with the different victims. So for example, with Mr. Holtmann, the first time Mr. Alarcon went to his house to take cash from him was 12:10 p.m. on June 10th. Mr. Alarcon and this defendant had a 59-second FaceTime call at 11:49 a.m. about 20 minutes before that. And immediately after Mr. Alarcon took the cash from Mr. Holtmann, he made -- had numerous FaceTime calls with this defendant.

It just -- and I know this is part of the sentencing argument -- it flies in the face of logic for this defendant to come here today and say he had no idea that senior citizens were being defrauded when he was coordinating so closely with another defendant picking up all the cash and going to -- back and forth to New Jersey with it. He was intimately involved in the various aspects of this conspiracy, and the entire fraud loss should be foreseeable to him, whether it was him, Mr. Alarcon and Mr. Hatcher or two other individuals that we believe were here at the same time who are going out and getting the money from the victims.

THE COURT: Let me just stop you there. So okay, you've got this defendant Hatcher and Alarcon, you've tied them together. You've got the information that you just described that shows connectivity.

What's the total loss associated with the activities of those three?

MR. VILKER: I'd have to ask the agent that, your Honor, but getting even more to that point, the other -- the people that we think met with other people, they were all part of the same scheme in terms of they're indicating the same attorney name that's posing as the attorney who needs the money to help their grandparents. The phone numbers are overlapping.

There's absolute certainty that they're all part of the same conspiracy; it's the same exact calls they're getting. And I think the bulk, the heavy bulk, of it was being picked up by these three defendants. I could ask the agent if she has a recollection of how much specifically was with the other --

THE COURT: What I'm searching for here is what is the limiting principle here? There has to be some limiting principle that applies to the loss amount.

And as Mr. Pabian said, it can't just be, you know, well, you're a part of the conspiracy and the conspiracy stole $10 million so you're on the hook for

$10 millions. We know that is not the law. So one way to look at it would be what evidence is there that ties this defendant to specific losses? You just went through that.

MR. VILKER: Right.

THE COURT: So there's whatever amount that is, whether it's a hundred thousand or 150,000, I don't know what the exact amount is, that's one way to do it. Now, you just made a reference -- first time I've heard this -- that there are two more people out there who were doing the same thing you think. So, you know, if there's evidence that connects this defendant to those people, well, and loss is associated with victims there, that might also be loss that he's responsible for.

MR. VILKER: Right.

THE COURT: But then, you know, this conspiracy is being organized by some higher-ups in the Dominican Republic or wherever they are. I mean, they are scamming people all over the place and, you know, obviously he's not accountable for that.

So where is the line? That's what I'm trying to get out of you.

MR. VILKER: Well, there's a temporal line; everything occurs in the same weekend. There's a four-

or five-day period where these three defendants and we believe two other people came, they stayed here in Rhode Island or nearby in Massachusetts. They were all going to different victims' houses; there were a total of 14 of them. And all the victims were responding to the exact same scam. It wasn't just a generic your grandchild is in jail, but this is attorney -- I forget the name -- specific individual, so all the victims are part of the same exact conspiracy.

But I did want to check with the agent about the issue of how much is attributable to these three defendants.

THE COURT: All right. Go ahead.

(Pause)

MR. VILKER: We're going to need some -- a little break. Some of it is mentioned in the presentence report. If I could have a five-minute break, I could calculate it because victim by victim we know which ones for sure were tied to these three individuals. We could be able to pretty quickly calculate how much of that loss was one of these three defendants picking up the cash.

THE COURT: Okay. We may do that in a moment --

MR. VILKER: Okay.

THE COURT: -- so that you can do that, but what

-- I want to make sure I understand this in its broader strokes.

The 350,000 is more than that amount or not?

MR. VILKER: It is, but the vast majority is part of that.

THE COURT: But what's the additional amount, whatever amount it is?

MR. VILKER: Well, that's what we need to calculate.

THE COURT: No, I don't mean what's the amount. I mean, what are those -- if they're not attributable to this defendant, Hatcher and Alarcon specifically, then where do those come from or do you need time to figure that out?

MR. VILKER: That's the question. There's some, one or two victims I believe, who we could not tie to the three defendants that appeared in this case. So I don't think that's going to change the guideline calculation, but I don't want to say without certainty.

THE COURT: Okay. So we will take a minute, but before we do that, I want to have you address the two level and the four level because I think those are substantial questions as well.

So you heard my questions for Mr. Pabian. I don't -- I can't make out what is the loss that gets

you over ten for those additional four. It's not in the PSR.

MR. VILKER: It's not in the offense conduct. They're listed as victims of the offense. There's no rule that something has to be in the offense conduct for it to be part of the case. We submitted a very, very detailed offense conduct. If we wanted to submit the entire case, it would have been a 50-page trial memo which was prepared in this case. All the evidence of those particular victims had been sent to the defense. This is not like a surprise information that they weren't aware of.

The additional three or four victims submitted either impact statements or have advised -- we, through them, advised the probation department that they were also victims of this case.

THE COURT: Okay. Let's just break it down because I think the reference is paragraph 39. There are seven that the government says are victims and Mr. Pabian concedes are, in fact, victims. So there's no -- the actual loss is there or shown; no dispute there.

Then there are the four that are in the last sentence there; Leonard, Ruth, Jeffrey and Theresa. They're not included in the offense conduct, and Mr.

Pabian is saying there's no evidence of actual loss associated with those victims. And that's what I'm asking you about.

MR. VILKER: I just don't -- they suffered actual loss; 12,000, 25,000, 18,000. We submitted -- we informed the probation department that these were additional victims that suffered additional loss. They're included in the restitution totals. If it's a factual issue did they suffer actual loss, then it's an evidentiary issue and I could put the agent on to testify about what their losses were as reported to them. There is no question they suffered losses.

THE COURT: I agree that this is a factual question. All I hear Mr. Pabian doing is trying to hold you to your burden of proof. And maybe -- I don't know if you have supplied that evidence to him.

MR. VILKER: There's not a piece of paper that we have, I don't believe, that they don't have, so he knows. I know he's new on the case -- I'm not saying he specifically knows -- but the defense knows about these particular victims, has the police reports from those victims, has everything to show. It really will not be -- we would need time to adjourn and prepare it, but it wouldn't be that big of a production for us to prove that these individuals suffered loss and what was

the nature of the misrepresentations that were made to them.

So if it's a question of us meeting our burden, we're happy to meet it.

THE COURT: Okay.

MR. VILKER: But I do think that all of that, that's for the two-level enhancement.

THE COURT: I want you to get to the four level and, you know, so why don't you address that. And I think, you know, you can begin with what Mr. Pabian began with which is that this was not applied to Hatcher.

So why does it come up -- and I don't think it's on the table with Alarcon.

MR. VILKER: It has been now added.

THE COURT: Oh, it is now? Okay. What's the deal?

MR. VILKER: Well, the reality of what happened is I came on the case, I got the objections, I was preparing a response, I was looking at the guidelines, and I noticed that there was an error that had been made, in my view, that there should have been a four-level enhancement instead of a two-level enhancement. I went back and I reviewed the victim impact statements, and it was very clear to me that

there were five victims that suffered substantial financial hardship based on the loss of their savings accounts or a substantial portion of them. And I raised that issue with probation. It couldn't be done retroactively with Mr. Hatcher because he's already been sentenced.

THE COURT: What's the proof that -- you know, the amounts are relative -- they're all relative, I mean, as he said.

MR. VILKER: It's not just the amounts, your Honor; it's their impact statements. I quoted five of them. I'll just read them to your Honor.

THE COURT: I read them right before I came out, what you quoted.

MR. VILKER: Right. They all talk about how they can't pay for repairs to the house; they can't pay for insurance; they can't pay for anything that's nonessential; that it's been overwhelming because they had to live on limited funds; that the house is in need of repair.

It's five of them that have talked about how difficult their life is now financially because of the loss. So I'll just read their first names. William, Mary, Sandra, Jacqueline and Sharon. All five of them didn't just check a box; they submitted impact

statements to the Court which detailed the substantial financial hardship that they suffered. Those are all part of the record.

And there's five other victims that suffered financial hardship that didn't submit letters detailing how much it hurt them, so I did not believe that would be appropriate to include them as substantial hardship victims. In those cases, I agree with the defense; just the numbers is not going to say much to you. But when you have five victims writing to the Court saying how much they have suffered financially, how this has impacted their lives and has dwindled their savings and they can't make repairs to their houses, on and on, if that's not substantial financial hardship, I don't know what is.

THE COURT: Well, I'm just trying to apply what the guidelines say. And the guidelines say suffered substantial loss of a retirement, education or other savings or investments fund. So, I mean, I guess you're saying that it's enough for a victim to say, as you describe here in your response, the financial stress is overwhelming because I live on limited funds. You're saying -- and I don't know what the amount is associated with -- that's the victim, first name Mary. I can't remember off the top of my head what her loss

amount is, but you're saying that meets that definition.

MR. VILKER: Yes, I do. I think when there's a victim that says the financial stress is overwhelming because they don't have enough money, that's substantial -- it's not a victim coming in here and saying I lost one million out of my hundred million and that sucks; this is an elderly woman who has no ability to replenish their savings who is saying that the financial stress in the loss of funds is overwhelming. I don't think we need to get into a forensic analysis of their bank accounts to determine how much they had before and after. These five on their own, they are not being coached to write these letters, on their own they're submitting these letters saying how it affected them.

THE COURT: All right. I understand your argument. So let me just see if we can kind of not make this last too long.

Let me ask Mr. Pabian. Do you agree that you've received the information of the actual losses associated with those four victims described in the end of paragraph 39? I think Mr. Vilker said it was 12,000, 18,000 and 24,000.

MR. PABIAN: Yes, your Honor. I think that's a

multifaceted question. I've certainly received discovery from the government and I think that's what Mr. Vilker's referring to, but the question as I view it is have these losses been proven in the record before this Court? And one of those victims in the document that Mr. Vilker is citing is just not mentioned in the PSR, and the government hasn't submitted any evidence to this Court to establish a loss, a substantial financial hardship, as a result of Bryan's offense with respect to that victim. We can't even tell by looking at what the government submitted what the circumstances of that loss were; we just know her name essentially and what the government says she lost.

So yes, we've received the underlying information. We do strenuously object that this has not been proven by a preponderance of the evidence in the record before this Court.

THE COURT: Well, what's the difference between what you have received and know with respect to those four and what you received and know with respect to the other seven that you concede the government has proven?

MR. PABIAN: Because for those seven, it is described in the presentence report this is how they incurred their losses. Mr. Hatcher went to Victim 1's

house and took X amount of money from her. Mr. Alarcon went to a different victim's house and took money from her. And that's the process by which we then have the opportunity to object, of course, and any of those issues are ironed out.

I mean, that just didn't happen here. There's just no information about the circumstances of the loss that's been submitted in any document to this Court for that one victim, you know. And I think part of the disconnect here is that the government and probation, as I understand it, both rely on five victims. One of those victims on each side is different. So the government relies on one victim that probation does not include as a victim of this offense, and probation relies on one victim who just checked the box on the form and didn't give any additional statement.

We argue that those are both insufficient and for that reason there's not five victims that have been identified as suffering a substantial financial hardship.

THE COURT: Well, I'm talking about -- I mean, we're talking about two things, the ten victims and the five victims on substantial loss. I'm just talking about the ten.

MR. PABIAN: Oh, okay, yes.

THE COURT: We've got seven that you agreed to, and then there's four that the government says -- they have given you the information of their loss amounts. What I'm asking you is what's the difference between the seven you agreed to and the four that you say they haven't proven?

MR. PABIAN: The difference is I just haven't seen a shred of evidence in this court that the other four suffered any loss as a result of Bryan's offense. Now, what might be in the discovery, I'm sure there's materials relating to those victims in the discovery, but, respectfully, I don't think that's the question. They are required to come into court and prove by a preponderance of the evidence, evidence -- and again this is brought up in our briefs, but a lot of the government's argument, in fact most of it, is based on things that's don't appear in the record anywhere here today or in the PSR. They are assertions made in a brief.

THE COURT: I hear your point. Then there is a difference between, you know, the discovery in the case and the evidence in this hearing, so I think that informs the government of what they need to come up with.

And so I think there are two questions. One is

loss amount; is there an amount that is something less than the 350 that you can associate with these various victims that, frankly, Mr. Pabian is going to have to concede to is correct because I think -- maybe you won't -- because it doesn't include, you know, these other losses from the conspiracy that you're not tying to them, whatever that amount is, and I don't know if it will make a difference. There's a 12-point adjustment. I don't know if this will make a difference in that adjustment or not. It might not. That's one question.

And the second question is what evidence you want to introduce to satisfy your burden with respect to those four additional victims. And if you produce that, then I think that you've hit the number ten. So do you want to take a recess?

MR. VILKER: Yes, I do, your Honor. I do think we need a five-minute recess, ten-minute recess, just to do the math, but the assertion that every detail needs to be in the offense conduct has never been the law. There is a provision. I'm looking at -- I'm not sure if I have the most recent presentence report, but at paragraph 38 it says these three men, Hatcher, Valdez and Alarcon, attempted to obtain $350,715. The total actual loss attributable to this conspiracy is

299,240. There are a total of 14 elderly victims.

That's like the catchall -- that was not objected to, it was not disputed. There's an agreement now that we're here in the presentence report that there's 300,000 of actual loss and there are 14 victims. The fact that there's a seven-page offense conduct section went on and on and on that not every single act in furtherance of this conspiracy was mentioned and not every single victim was mentioned, there's an agreement already before this Court that all of these victims are included. But I do think it is important to calculate, at least for this purpose, how much -- I don't think it's very much at all -- how much could be attributable to not the acts of these three particular defendants.

THE COURT: So here's the way I size this up. A lot of times you don't get objections to these things and it is kind of just swept up in the offense conduct and, you know, counsel has seen the discovery, he knows that you could put on evidence on these folks and they don't raise an issue. It doesn't mean it's improper to raise the question and to put the government to its proof. And I think that's all Mr. Pabian is doing.

Other times there's a binding plea agreement and people don't want to spend the time in a sentencing

hearing arguing over these things if they know what the sentence is going to ultimately be. So there are different reasons. But I think Mr. Pabian is right that there's at least a good argument that the loss amount should be the amount that these -- maybe he wouldn't state it this broadly -- but that these three defendants are responsible for stealing from these various victims and that there's an amount there, whatever it is, and that the number you've used, that probation used, is actually more than that. And he's just saying there's a line where you have to stop.

MR. VILKER: Okay.

THE COURT: And you may actually agree with where that line is.

MR. VILKER: We're getting to the same point where I think we need to do the math here.

MR. PABIAN: If I may just add one point before we do that?

THE COURT: Yes.

MR. PABIAN: I think the government mentioned something to the effect of it wouldn't make a big difference numbers wise. We disagree with that. You know, by our thinking, isolating the losses that these three defendants were in combination responsible for should exclude the things that, frankly, none of them

had anything to do with, like gift cards, wires to the Dominican Republic, UPSes to Florida. There's certainly nothing connecting Bryan to any of that conduct. I don't believe there's anything connecting any of the three defendants to that conduct.

And just the fact that it happened to the same -- some of the same individuals that also had cash taken from them, to me that's just not enough to make that different conduct that, again, occurred after Bryan was arrested in large part, reasonably foreseeable to him.

MR. VILKER: I'm in complete disagreement with that fact. Just to kind of like put a point on that, William, we'll say, he's a prime example, he lost over a hundred-thousand dollars. The first cash that they lost was Mr. Alarcon, after coordinating with this defendant, went to his house and took cash. Mr. Alarcon a couple of hours later, again, back and forth in phone conversations with this defendant, went back, took more cash from William. Then someone else kept calling William. At that point they saw that he was playing -- he was a victim in this, he was willing to give money, and someone else was calling him getting him to send gift cards and wires and all this. All of William's loss is attributable to these three

defendants, is my feeling.

THE COURT: Right. But I remember his victim impact statement very clearly and especially when he was talking about the gift card part of that, you know, so that's pretty fresh in my mind. And I think that is a -- I don't know what I think about that issue because I get why you would say it's connected because, you know, what they're doing is connected to the calls that these victims are receiving from whoever is running the conspiracy and making these calls with them.

But on the other hand, they're not -- I don't know if there's any proof that they knew about those additional calls or those additional efforts, the ones that relate to wire transfers and gift cards and all that business. And there doesn't seem to be, if I'm remembering correctly, doesn't seem to be anything that connects them to that in terms of, you know, going and collecting anything or facilitating anything like that.

So the only thing that connects them to those losses is the fact they're part of the same conspiracy. And then I think then you're into that legal question of, you know, are you held responsible for all the losses of the conspiracy? Where is that line? I'm just not sure.

MR. VILKER: I understand that, your Honor, but

when they -- they're proving that this particular elderly individual is a victim and willing to depart with his cash. They are then communicating obviously to their higher-ups, whoever was working with them, that William's game here. And then they go ahead and we can't keep going and get cash; we have to try to come up with something new.

I think it's a fair argument if there is individuals that are not connected to any of these three defendants, and I do want to calculate that, but I don't really see how that's reasonable to parse out the particular ways in which they're defrauding each victim when they are having contact with the victims and it's the same scam over and over and over again. Mr. Alarcon goes to William and says he's picking up money for his granddaughter, and then later in the day someone else calls and says, oh, we need more money for your granddaughter; send it in terms of gift cards. It's all the same case, it's all the same victims, it's all the same conspiracy. It's all reasonably foreseeable. They don't have to know the precise details of the how the scheme is working.

Obviously, I feel very strongly about that. But I do think that we need to find out about any losses that are not attributable directly to these three.

THE COURT: All right. Let's take a ten-minute recess, and then we'll come back and finish this part and then move on to the sentencing part, okay.

MR. VILKER: Thank you, your Honor.

THE CLERK: All rise.

(Recess)

THE COURT: Okay. Mr. Vilker.

MR. VILKER: All right. So your Honor, the facts are that there are 14 total victims including intended loss. There were ten who suffered actual loss. One of them was a couple, so they're really one victim I think for this purpose.

THE COURT: Are they one or two because that kind of matters, doesn't it?

MR. VILKER: Well, I'm not sure it's going to matter after I get through this whole explanation.

So of those ten, there were eight of the ten that suffered financial loss that the person who picked up the money was one of the three defendants in this case. The two that were not were some unknown courier. And we know they are all connected because the same phone numbers are calling the victims and all that, but we don't have evidence that, we don't believe, that one of the three of these defendants picked them up, are Jeffrey and his wife who is one of them and Leonard L.,

they're combined losses are $37,000.

So if we deduct that $37,000, even though I still believe it's all part of the same conspiracy, it's all reasonably foreseeable, but assuming I'm wrong on that, that would reduce the total intended loss to $313,715 and that would reduce the total actual loss to 262,240. It wouldn't change. The guideline is the intended loss has to be greater than 250. So it wouldn't change the guidelines at all, but it would reduce the restitution amount if the Court were to agree with that.

THE COURT: Okay.

MR. VILKER: And neither of those two individuals are included as victims of the substantial loss, the four-level enhancement, so that would still apply. There's five individuals who were reached out to by one of these three defendants who picked up the money that, based upon their impact victim statements, we believe suffered substantial financial loss.

THE COURT: All right. The only way it would come into play is if I did not agree on the four-level enhancement. That would then lead to the question of whether there's a two level.

MR. VILKER: Exactly. If you took off those two victims, the ten become eight.

THE COURT: Right. All right. Okay. Thank you.

Any final argument now and I'll make the rulings.

MR. PABIAN: So I also went through the PSR during the break, and I have reached a different conclusion, as I expect you might expect.

So what I see in the PSR are the seven victims that we've talked about conceding with the caveat of reasonable foreseeability as victims who suffered an actual loss. I believe -- again, this is speculation, perhaps probation can speak to it in more detail -- but it seems as though the three that probation concluded were not included in this offense are perhaps three that were not interacted with by any of these three defendants.

I don't know the answer to that. All I can say is I don't see anything in the PSR or anything else that the government has submitted to the Court in this case proving that Bryan or one of his two codefendants took money from more than seven actual victims.

You know, I think that the other issue that I want to come back to are these gift cards and the wires. There's just not a shred of evidence connecting Bryan to any of that other than the fact that he's in

the same conspiracy. The government says, well, that must have been communicated to the higher-ups that these were willing victims. Maybe, maybe not. There's certainly not any communication in evidence that involves my client. I don't know if it's a communication that came from somebody else or perhaps they put two and two together by the fact that the money made its way to them.

But I just think that there's no evidence of reasonable foreseeability to attribute those losses to Bryan. And those numbers are much more significant; in fact, it's the bulk of the loss for two of the biggest victims in this case, you know, $70,000 for one victim I think and upwards of 60,000 for another. So we don't believe those are reasonably foreseeable and don't think they should be attributed to Bryan.

The last thing I'll say is just by my count, going through those seven victims and adding up their intended loss, I come to approximately $121,000, which would make a difference for guideline purposes. And of course, I say that without waiving our other arguments that we don't even think all those losses were reasonably foreseeable to Bryan.

THE COURT: All right. Thank you.

Well, this has been a lot of argument on these

fine points of the application of the Federal Sentencing Guidelines, and I apologize to all the people in the gallery for all of this. I'm sure it seems kind of incomprehensible. And believe me, I would avoid it if I could, but I can't. I'm required to try and figure out how the guidelines actually apply. And we had to do that task as precisely as we can applying what are sometimes some pretty esoteric principles in the Federal Sentencing Guidelines. And then once we do that, we can move to the heart of the matter which is the actual sentencing, but I can't get to that until we get through these guideline issues.

So with respect to these objections, my assessment is as follows. With respect to the loss amounts, with the adjustment that the government has just put on the record making the intended loss 313,750 and the actual loss 262,240, I think that accurately captures the loss amounts, notwithstanding the arguments made by Mr. Pabian on behalf of the defendant with respect to the losses associated with the additional wires and gift cards and so forth.

And while I respect that argument, I disagree with the premise of it. My sense of the evidence that is in this record, which is not just in the PSR but also in the plea, is that the overall conspiracy is

much broader than these victims responded to the information that was collectively gleaned from the collection of the money from the individual victims, and those victims that were intended to be the most willing to be victimized were preyed upon further. And the question is, was that additional victimization of those victims reasonably foreseeable to these other defendants, not did they specifically participate in identifying the targets and what should be done and make sure -- you know, go after William for gift cards or whatever, that doesn't have to be the proof. The question is whether those additional losses are reasonably foreseeable to this defendant. He doesn't have to know exactly what they were or when they happened.

And I think the answer to that question is, yes, they are reasonably foreseeable. So it is appropriate for him to bear responsibility in terms of the calculation of the guideline range for those amounts. And those adjustments, as Mr. Vilker said, won't change the guideline calculations.

Now, it's always the case, and as Mr. Pabian effectively points out in his sentencing memorandum here, the fraud calculations in the guidelines are some of the most controversial. And it is worthy of

consideration these arguments that you've made, but haven't prevailed on, are also worthy of consideration in the question of what the ultimate sentence should be. So that's a long way of saying that I'll take that up in consideration of your motion for a variance sentence.

Now, the second question is this four-level enhancement for substantial financial hardship. The guidelines are vague, to say the least, with respect to what qualifies as a substantial financial hardship under that third -- number three. The others are fairly specific, but this is very broad. And it strikes me that the victim impact statements here cleared the bar of demonstrating a substantial loss to savings or investment accounts.

The victims are not lawyers, they're not writing things in a way that is -- has a lawyerly precision to it that you can glean from these victim impact statements that these losses, even where the losses were in the teens or the twenties of thousands of dollars, have dramatically impacted the lives of these individuals because they're elderly and they can't make it up, they can't get it back. You know, this was money set aside for healthcare, home repairs or whatever. And they're not in a position to recapture.

They're not working.

So I think that the evidence may not be overwhelming, but the evidence is enough to satisfy the preponderance-of-the-evidence standard for losses. So all of that is a long way of saying that those objections are denied.

And then as to minimal role, the minimal-role objection which I heard argument on, I do not believe a minimal role is appropriate for this defendant or for any of these defendants. While they're certainly not at the top of the pyramid, my view is that having presided over all three of these cases, that these defendants were integral players in this scheme; and they've been characterized as couriers often, but I actually don't think that's a fair characterization of these defendants. I think they're more than couriers, and I don't believe their role in the offense is minimal. It would not have been carried out, even remotely carried out, without their participation.

I think that disposes of -- there was an objection on the restitution amount, but I actually think the modification that Mr. Vilker has suggested is consistent with my rulings which makes the restitution amount which is 262,240 the actual -- the adjusted restitution, right?

MR. VILKER: That's correct.

THE COURT: Okay. With that, I'm going to outline now the advisory guideline range, and then we will move to your arguments with respect to the sentencing.

The base offense level as detailed in paragraph 44 is a level seven. As we have just discussed, the loss amount is greater than $250,000 and that applies the 12-point adjustment. We've also discussed the four-level enhancement because it was a substantial financial hardship to five or more victims. It provides a four-point adjustment. That yields an adjusted offense level of 23.

The defendant receives a three-point downward adjustment for acceptance of responsibility. So his total offense level is 20. The defendant has no criminal history points so he falls into Criminal History Category of I. And at offense level 20, Criminal History Category of I, the defendant's advisory guideline range is 33 to 41 months of incarceration. So with that I'll hear from the government with respect to the appropriate sentence.

MR. VILKER: Yes, your Honor. I did want to let the Court know that seated in the courtroom today there's a couple of victims and the daughter of a

victim. There is Mary Mountain, who was the individual this individual approached, and her son Jason, as well as Katie Merolla, who is the daughter of Elaine Merolla. And Ms. Merolla has prepared a statement. I don't know if you want to hear it now or after argument.

THE COURT: I'll leave it to you how you want to present that.

MR. VILKER: I think at the end, if that's okay. Thanks.

Before I begin with my 3553 argument, your Honor, I did want to address the argument that the defense is making that the fraud guidelines in general are overstating this particular conduct. And I'm the last person in the world to say the guidelines are always perfect, that they take every consideration into account, but in this particular case I think the guidelines get it wrong because they're too low. I really believe that. The defense cites a case talking about criticizing the fraud guidelines from the Eastern District where they say that the fraud guidelines don't have any approximation of the moral seriousness of the crime by weighing the loss so much.

And I think in this case, the moral seriousness of the crime is greatly in excess of the amount of loss

that took place to the particular victims. The guidelines don't have any extra enhancement for vulnerable victims, even though it's arguable that that would apply. They don't have a -- there is now this substantial -- the enhancement for the substantial loss to the victims so that takes part of it into account. But the moral heinousness of this crime of approaching 14 elderly people with no -- to take their savings by making them in fear of their grandchildren's safety to get them out of jail, the people that they love the most in the world, I think these guidelines honestly get it wrong. That being said, the government is asking for a guideline sentence in this case, the 33 months, which is now the low end of the guideline. And we believe that the 3553 factors call out for a very significant sentence.

The most importantly in this case, as I was just alluding to, is the seriousness of the offense. This is, in my view, one of the most horrendous types of fraud cases that we have in this district; going to senior citizens that are scared to death about their grandchildren and taking their money. Preying on them. As your Honor I'm sure knows, this type of crime is rampant in this society. Senior citizens unfortunately are often easy victims for these crimes for a large

number of reasons, including that they have money; many of them saved up from their lives. What they really care about is their grandchildren. And because of their age, they often more susceptible to these types of scams.

Last week or the week before, Judge McConnell had a case -- the defendant's name was Dominique Golden -- and I'm not saying this case is identical to that case, but that was a woman who was laundering money from almost the identical scam; scamming elderly people. And Judge McConnell gave her 78 months in jail and talked about this as the -- in his view, the worst type of fraud case that we get in this district.

Now, that case involved far more money which drove the guidelines; that case was 1.25 million so about three to four times the amount in this case which bumped her guidelines way up, but importantly, that defendant never actually met with any of the victims and wasn't there on the ground meeting with the elderly people to take their money. So you could make an argument that this particular case is even more reprehensible.

But all of which is to say that this is a very, very serious offense and for all the facts I won't get into, all of his particular involvement of having

envelopes full of cash and communicating with the other defendants, he went to Mary Mountain's house, tried to take her money, she was prepared but then she took out $10,000. She's, I think, 91 years old. And he went fully prepared to take her money. If it wasn't for the incredible act of bravery and very impressive acts of her son who is here today, she would have been handing over her cash. He just happened to show up at the right time right before this defendant was about to take the money from her. My understanding is he saw his mother with some cash in her pocketbook and asked her what was happening, why she had this cash. He got her to tell him that their, I believe his daughter, his daughter needed money for bail. He realized it was a scam and he went out and subdued this defendant, you know, with quick thinking that is very much appreciated by law enforcement.

But the harm to the victims in this case, your Honor, are so severe. There's the financial harm, and we talked earlier about the victims writing about how they -- you know, this ate away a significant portion of their life savings and now have to put off things like repairs to their houses and, you know, live month by month and all that that entails. But there's also the severe emotional harm. These are people that were

preyed upon. These are people who are now filled with stress and anxiety. They doubt themselves. They feel like they no longer have confidence in their ability to know if people are telling them the truth or if they are being scammed.

And I think it's really easy in this type of setting now that we're a year and a half past it and we have a defendant here who is a young man and seems, you know, apart from this to otherwise be a decent human being, it's easy to kind of forget or look past what the effect of this crime was upon these individuals. And this is -- other than the one victim's family member who wants to speak to the Court, you know, I'm really kind of their voice now so I feel, you know, reading just a couple of paragraphs from some of their statements is important for the Court to hear again to keep this in perspective.

Mary from Cranston wrote, "I have experienced depression which I now take medication for. A lack of sleep. The financial stress is overwhelming because I live on limited funds." Loretta wrote that this has taken an extreme toll on both her and her husband's physical and mental health. That she's now worried about the cost of nursing homes. She doesn't sleep at night. "It's caused me to withdraw from people and not

answer the phone."

Sandra wrote, quote, "I not only lost my money but, most importantly, I lost my self-esteem and trust in myself. I'm still afraid to answer my phone. I can't sleep because I wake up reliving this nightmare." Ruth wrote, "I'm insecure about my ability to recognize what is true," and that she's depressed and seeing a counselor. Jacqueline wrote, "I have lost many nights' sleep. I'll never be able to trust anyone again and no longer feel I can answer my phone without screening the calls."

So this particular effect with this group of victims, this particular crime with this group of victims was devastating on these people. And this kind of serious conduct needs to be punished. There's also a value and importance for deterrence. I think for this individual sitting before this Court there's a need for deterrence. He's a very capable human being. He's healthy. He's intelligent. Doesn't have a substance abuse problem. He has a real estate license. He can work as a barber. He has invested in stocks.

He has everything in his disposal to go out and earn an honest living. The only reason he did this offense and committed this offense was to earn a quick buck. There's no financial desperation. I understand

he has financial issues at home and I don't want to downplay that, but this was his way of instead of going out and working for a living, he decided to do this knowing that, at least certainly at some point, he was going to be taking the money from elderly people to support his own lifestyle.

And I also think general deterrence is really important in this case. As I mentioned earlier, these types of cases are a plague on our society now. They are happening everywhere. We have many of these cases at various stages of investigation in our office. Senior citizens are like a sitting duck target for fraudsters, and we need to consistently send the message whenever we catch any defendant, no matter what their role is in the case; if it's the person making the calls from overseas, and obviously we catch far fewer of those for logistical reasons or evidentiary reasons, or it's people like these defendants who come and they meet with the victims and take their money, or it could be the money launderers. I know your Honor has a case like that that is pending sentencing who are getting the money into their bank accounts and then sending out overseas.

Anybody who is part of this chain needs to know that if they're apprehended, they're going to go to

jail and they're going to go to jail for a real amount of time. There needs to be deterrence out there. There needs to be a consistent message that we, as a society, are protecting the most vulnerable among us; that's children, a lot of cases that we have, and in this particular scenario it's senior citizens who we need to protect.

The last 3553 factor that I wanted to talk about, your Honor, is punishment. And this overlaps a lot with deterrence. But I also think sometimes we lose track of this when we see a human being here. We all feel bad looking at a person, especially a young person like this defendant, and sending him to jail. It's not a pleasant feeling for anyone. But we, as a society, function where in situations where we respond to serious crimes that have -- especially crimes that affect people in this kind of way with punishment, and the only punishment we really have available to us other than some fines in some cases is putting people into jail.

Punishing people that commit these types of crimes is important for society; it prevents the public from losing faith in the judicial system, in the prosecutors, which can occur if these types of crimes are not met with jail. It gives a sense of relief, a

sense of vindication to the victims to know that, yes, I went through all of this, but society was there for me and this defendant is getting his punishment. All of this needs to be balanced with many other factors; I'm not saying this is the only factor, the most important factor, but it is a factor.

Punishment prevents vigilantism which can occur in society and occurs throughout the world in societies in which people feel no confidence that the judicial system is going to punish the people who commit wrongs. It's an important 3553 factor that must be considered.

And the last thing I'll say before I sit down, your Honor, is I think we are at the point now where it's important for the Court and the government to seriously think about the First Step Act and its effect on defendants being sentenced in this Court. I attended a presentation by the Bureau of Prisons a couple of weeks ago. The First Step Act is up and running; it's running. It's available to every defendant who qualifies. There are certain crimes that don't qualify; sex offenses, some drug-trafficking cases. This crime clearly qualifies.

This defendant will have, if your Honor sentences him to prison, the opportunity to take a variety of different programs and different vocational

programs, psychological services, dozens and dozens of programs. And if he does so, he will be able to get 50 percent off his time. 30 days for -- 15 days for every month he will have access to if he takes these programs. On top of that, he'll be able to get something if he is on good behavior, another 15 percent off.

So the reality is we're not anymore -- and this is a learning curve for all of us at this point -- we're not in a truth in sentencing federal system anymore. We're in a very different world where the sentence that's being imposed by the Court, in this case the defendant, if the Court were to sentence this defendant to what the government is asking for, 33 months, my calculations, if the defendant does the program and is on good behavior, he is actually only going to serve 14 months. The defendants nowadays, as long as they qualify and they don't have one of these offenses that are nonqualifying, will serve about 40 percent of their sentence.

I think that's something this Court has to consider. This is a defendant who will have the opportunity, if he's serious about rehabilitating, serious about getting more vocational training, about not doing something like this in the future, he'll have

the opportunity to prove it. He'll have the opportunity in BOP custody to earn those credits. I don't think they should be given upfront to a defendant who has those opportunities available to him.

And I think some period of jail in this case will ultimately likely be 14 months at the maximum no matter what this Court imposes is necessary to punish this conduct and to deter others. Thank you.

THE COURT: All right. That's the first time I've heard that argument made. I think the thing that I think I should say or ask you about is it strikes me that it would be inappropriate to sentence a defendant to more time with the anticipation that he's going to earn that sentence down. So I hear what you're saying, and I didn't actually until now, I didn't realize that there was that substantial of an effect.

MR. VILKER: Right, right.

THE COURT: I think I need to come up with what I think is the appropriate sentence and then the chips fall where they may in terms of what credit he's able to earn. Do you agree with that?

MR. VILKER: I agree with certainly the first thing your Honor said. I don't think your Honor should be sentencing him higher in anticipation of it being reduced at some point. I think your Honor has to look

at all the 3553 factors and come up with what's right.

I do think that part of the sentencing calculation is rehabilitation and knowing that there's programs in place that this defendant will have available to him in prison which will give him the rehabilitation programs that the Bureau of Prisons believes will help him and if he takes those up will reduce his sentence by half; I do think that's something your Honor can consider in terms of the role of rehabilitation in an appropriate sentence.

THE COURT: Okay. Thank you. Did you want Ms. Merolla to give her statement now?

MR. VILKER: Yes, please.

THE COURT: Good afternoon.

MS. MEROLLA: Good afternoon. My name is Katie-lyn Merolla. I'm Elaine Merolla's daughter. This is a little emotional so bear with me.

THE COURT: I understand. Take your time.

MS. MEROLLA: I'm just here to detail to you what happened to my family because we need you to know how these -- the circle of individuals affected my family. My mother was not comfortable coming here today and asked me to come and speak on her behalf and my sisters and my whole family's behalf.

She's not comfortable coming here is putting it

mildly. Even though it may seem like a simple financial crime, I can tell you that as her child it is not. It stole my parents because my parents before that day were highly energetic, engaging, focused, strong, self-assured and secured people. And all of that was taken one afternoon through a well-coordinated and systematic approach to first scare my mother about the welfare and safety of her grandson and then circle back with an outreach of kindness and support from a stranger who supposedly knew the family. Then a hurry-up-and-wait style barrage of phone calls that transpired over hours upon hours. Some calls rushed and filled with police and court information, gag order information, accident information, bond information, and then some were deliberate and slow befriending her. Talking to her about her job. Because, yes, as a sidenote, in her early 80s at that point, my mother was still a mathematics professor at New England Tech, day and evening courses. She was a highly capable, confident woman.

And some of those calls were engaging and chatty about her kids, grandkids in her life, but then a frenzy of other calls would take place where she would have to count out money over the phone, list serial numbers on the bills. The circle of escalating and

emotional calls went on for hours. And how do I know this? Because I was the one who showed up that day just to check in and have coffee and see if there was anything that needed to be done.

On that day, I found my mother near tears surrounded by money hastily speaking to someone on the phone, scribbling down numbers on the outside of an envelope. I had never seen her this frantic, not without someone who she loves being in the hospital or seriously injured, and I immediately became worried. She got off the phone and wouldn't tell me what was going on. She said she was under a gag order which I didn't really understand. So I said that was fine; I will just stay with her until it was all sorted out as she was visibly upset.

I was confused and worried that something terrible was happening to someone in our family and concerned that she was so frightened. After listening in on the hushed phone call, I became further worried. My mother was supposed to take $6,000 in cash to a bondsman. A woman in her 80s was supposed to take six grand in cash to Cranston and to a bondsman. I was horrified. I told her I heard and she didn't need to tell me why it was so hush hush, but I wasn't letting her bring cash anywhere by herself. I tried to lighten

the mood and said, besides, I've never been to a bondsman; this could be an interesting mom-and-daughter adventure.

My mom laughed and began trying to research bondsmen in Cranston that she might need to go to. I could tell my mom was relieved I would go and not ask any questions. But here's the thing. My family is really close. We are big; we are 25 deep, including grandkids, and we have no secrets from each other. We celebrate everything together and we hold each other when we're down. My mom keeping a huge secret, that scared her, scared me.

I wasn't going to let her deal with it alone. At that time, my father had had some health problems so I was between where they were both in the house, but the office upstairs where my mother was and the family room downstairs where my dad was.

At some point, maybe an hour later or so, the phone rang again and I raced to my mother's office to listen. I heard her say, I can just come to the courthouse, it's no problem, it's not that far away. Then I heard her say, Okay, I can do that. Then she hung up. I asked what now, and she said that he said he knew someone who is going to come pick up the money for the attorneys and that they would bring it to him

to the courthouse. As it was very late in the afternoon, the courthouse was closing and if they didn't get it there in time, the family member would have to stay overnight. I was sick to my stomach instantly because I had deduced from the little things that had slipped out in her chatting that afternoon while waiting for the phone that the money was for my nephew David, her grandson, who might have been hurt in an accident and something to do with a rear-ended car accident and he was sick.

Understand prior to finding out someone was coming to pick up cash, this all seemed a little plausible except for the gag order. My mother is very close with all her grandchildren. If something happened and they couldn't get in touch with a parent, they would call her or text her. That's how close she is with everyone. But after that call, I was horrified. My mother went to go wait by the front door for the car with a large envelope with cash with a docket number on it, and I immediately ran to her back deck where I could see her through the door, and I texted my nephew and asked him if he was okay. Then I called my nephew because I was panicking. He picked up, but we had a bad connection and I had to wait for him to call me back. By the time he did, I was frantic

and I was watching my mother pace through the front door while I watched through the back.

Just hearing his casual voice, I knew he was in no danger. I asked where he was; he said work. I asked if he was okay; did you get into an accident and he said, no, he was fine. He sounded baffled. And I said something like someone said you were hurt and being held by the police, and they're coming to mom and papa's house to get money and I have to call the police. And I hung up on him.

I did call the police right away and explained that I thought someone was coming to collect money from my parents in a grandparent scheme and the dispatcher said something like, well, that's fraud, not 911. I said, no, you don't seem to understand. Someone is coming here to collect $6,000 in cash from my two 80-year-old parents right now that they know that they have and I am in no way in shape to defend them or their home. I need a car and someone here. Because honestly, that's how I felt. No one knew I was there; I wasn't supposed to be. They had her count out serial numbers and cash over the phone. They had her talking about her life and my dad's life. They knew they were two elderly people alone with cash.

Thankfully, the police said they could send out

someone but had no one in the area right then and to lock the doors and we would act like we were no longer home. I then called a family friend who was a retired police officer and didn't live too far away and begged him to come to the house and help. And what, I had no idea. I ran to my mother and yanked her away from the door and then ran around the house locking all the doors and pulling all the curtains all while trying to explain to my mother that the good news is her grandson was fine, but the bad news is that we were about to be robbed.

Then we saw this little gray car come from the end of our neighborhood that had no outlet which meant it must have driven by and then came back down the street so it was facing towards the opening of the neighborhood. She said I think they just pulled up and parked across the street. She whispered to me, I think I saw that car earlier when I was up in the office and waiting for a call and looking out the window. And then she said, Wait, maybe I saw it when I left this morning when I went to the bank.

We both were just quiet in silent horror and terrified. I was horrified that someone could have been watching her all day with this money. She was horrified that she led us into something terrible and

she was beginning to panic. I tried to calm her by saying it's fine, we are just no longer home. They will have to break the doors down and the police are on their way.

We watched as a man got out of the car and walked into the driveway, and at which time I raced through the house trying to keep my eyes on him as he circled our cars in the driveway. I realized this time I left my windows open and he was looking deeply into my car. I was sick to my stomach. Then I lost sight of him through the thick bushes surrounding my parents' house that is set quite back, deeply back from the street. I didn't know if he was in the backyard where there were other doors or if he was heading to the front.

I ran back towards my mother and took a picture of the car parked across the street. We waited. And then suddenly my sister, Elaine, David's mother, pulled up. I was dumbfounded. She was outside right near the guy's car. I called her quick and said to take a picture of the license plate of the car across the street right now. I didn't know her son had called her after I hung up on him telling her that I didn't -- I wasn't making much sense. Something about him being hurt, needing to call the police and that someone was

coming to get money from mama and papa and that Auntie Katie sounded very distressed and upset.

So she was already upset and distressed when I called her and immediately responded with, That car right there? And I whispered, Yes. Just come in across the yard quick. Someone is outside I think in the driveway.

At that point she hung up on me to take the picture and then she saw him on the property and began to yell at him and ask him what he was doing there and did he call and threaten something about her son and being hurt and needing money. She started videotaping the exchange. I heard the yelling from where I was inside and was immediately sickened. I thought I sent my sister to her death. I had no idea if this person was violent and what was going to happen and if I just handed someone as a hostage.

So I told my mom to hide the money and I locked the door behind me, and I raced outside across the lawn to help my sister. My mother was horrified and begged me not to go but just to get my sister inside. By the time I had arrived to my sister, he had run down the driveway and he had jumped in his car and sped away, which also happened to be at the same time Warwick Police arrived down the street and were able to pull

him over as he raced through a red light. And then they detained him.

But see, it didn't end there for my family. Somehow the guy on the phone that had been calling all day acting like my mom's best friend found out about the arrest and within an hour or so after the police first left he began calling her back asking her if she thought she was smart, thought she was tough, thought she was funny. Reminding her that he knew where she lived, what she looked like, where she worked and what car she drove. He then asked her if he thought I was funny or smart for getting the police involved and then he described what I looked like and what car I drove, and we both were sick to our stomachs because the guy in the silver guy never saw me. He saw my sister who looks nothing like me. It was then that we started to realize that maybe they had been watching us and at some point someone saw me in and around the house. He knew the exact outfit I was wearing.

And that there is when we lost something important to the strength and bond of our family; we lost our parents because, you see, all the strength, security and power that they had slowly slipped away after that encounter. It didn't just end with the police dragging someone away. And the guy didn't make

one call; he made a couple heated calls over the course of a few hours.

I sat with my mom until late that night. She was visibly shaken and scared for my safety as a single mom living on her own and scared for her safety and her ailing husband, scared of what kind of vile people she had let infiltrate her family and her life. She began to wonder if she was senile and confused.

Then over the course of the next few months, she would go to work every day scared she'd be jumped in the parking lot. She would be worried about going to the grocery store. She was worried about answering the phone. To this day, you can barely get my parents to answer the phone now, both so worried they will fall into some trap that will endanger their families. So if you were to ask me how long I think these people should be put away, I would say forever because I'll never get my parents back. They're in their 80s. There is no time for years of counseling to help them heal. There's no time for them to gain back their security and self-reliance. And it's been stripped from them and will never come back.

And so these people might not have gotten money from us that day, but that day they got something more important; they stole my parents. And why won't my mom

come today? Because she can't bear to go through it and see them and be scared of how her words would possibly again put her family's lives in danger and she's scared that there would be repercussions. But she did want our little story told to you so you would understand what happened to us that day and what sort of crime transpired.

Again, I thank you for listening to me. I really hope you take her story into consideration and not just for us, but for all the victims of these crimes. These individuals stopped and preyed on vulnerable people, and they steal so much more than money. Thank you.

THE COURT: Thank you. Thank you for doing that.

All right. Mr. Pabian.

MR. PABIAN: Yes, your Honor. Thank you, your Honor.

I want to start by stating the obvious; you can't help but feel for what the victims and their families in this case have gone through. The illegal conspiracy in which Bryan participated caused great harm, there's no question. With that said, it is also important for sentencing purposes to put Bryan's participation in that conspiracy in some level of

context.

Bryan's involvement spans a total of five days. As terrible as what happened during that time was, it stands as a clear and brief aberration in Bryan's life. I don't think any of us would want to be measured solely by the worst week of our lives.

Now, before I forget, I'd like to just briefly address the First Step Act argument that the government had mentioned a few moments ago. That was not something that was mentioned in either of the memos that the government filed in this case so it's, frankly, not something that I've been able to do the math on and respond to. I do know from prior cases, at least months ago, that there was significant variability regarding the availability of those programs at different facilities, so I would urge, as the Court said, to simply impose the sentence that the Court believes is appropriate in this case and certainly based on what I know were not warranted in assuming that he's only going to be serving 40 percent of his sentence if he does the right things.

So when we take a step back and take a look at the broader picture of Bryan's 23 years, what you see is, the defense submits, actually pretty remarkable. Bryan arrived in this country of a boy of around 13

years old living with his mother in New Jersey. He was a relatively normal kid going to school and playing sports in his free time. But Bryan had to grow up faster than anyone should. His mom, who suffers from several serious medical conditions, was not able to earn enough money to support the family.

All of a sudden Bryan, at the age of about 16, found himself facing some very real-world responsibilities far beyond his years. He needed to help keep a roof over his family's head, food on the table and the lights on. I think it's telling that in this moment at 16 years old, Bryan didn't turn to crime; he went to a barber shop owned by Betsy Reyes, who submitted a letter on Bryan's behalf here today, and asked for the opportunity to cut hair.

Bryan still supports his mother to this day. Due in large part through her medical ailments, she is not able to work or keep up with basic household chores. I want to note for the Court that Bryan's mother is here today, as are his girlfriend and his brother, and they all are supporting him through this process.

Bryan's impact has also extended far beyond his immediate family. Exhibits 2 and 3 to our sentencing memorandum reflect Bryan's extraordinary efforts to

care for his brother's girlfriend's family when they were infected with COVID-19 in early 2020. Bryan took in and helped care for not only his brother's girlfriend, but her kids and her mother. And Bryan didn't get anything out of doing this. In fact, he put himself at great personal risk. As I'm sure we all recall, this was a truly terrifying time to be exposed to the virus. He did it because that's just who he is.

We have letters from multiple other friends who Bryan took in when they were homeless, and those same letters attest to Bryan's, I think, uncommon level of empathy for his age. He is the person who in the middle of a party will sit and listen to someone in need vent about their problems. He is a sympathetic ear consistently available to a friend grieving a personal tragedy.

I think the letters as a whole speak to Bryan's unique ability to lift others up and to help them persevere through the most difficult of times. How many people in their teens or early 20s demonstrate that type of caring and maturity? Certainly not many that I have known, your Honor.

This Court may be left wondering as I did when I first became involved in the case, so how did this happen? How did someone like Bryan allow himself to

become involved in conduct so reprehensible? And I think the answer is really a combination of things. First, regardless of how quickly Bryan was forced to grow up, the fact remains that he was 21 years old when these events occurred. Second, there was pressure for Bryan to provide for his family.

As the Court can see from the financial records attached to the PSR, Bryan and his mother are having difficulty meeting their basic day-to-day needs, let alone saving for her necessary medical care. Now, of course, it goes without saying but I think it still needs to be said, this did not give Bryan the right to steal anyone's money, but it might help explain why he didn't ask more questions when he was initially approached about the possibility of being a courier in Rhode Island.

The third reason I think relates to the limited role that Bryan was asked to play in the conspiracy. Now, I understand it's the Court's finding that he was essential to this conspiracy and we respect that finding, but we submit that his role still has to be weighed in context, in the context of what he actually did. He wasn't asked to lie to any of these victims. He didn't even interact with any of them directly until immediately before his arrest. The nature of Bryan's

participation allowed him to, in a sense, lie to himself and think that maybe what he was doing was okay.

Well, your Honor, it wasn't okay, and Bryan is not lying to himself anymore. And that's why we're here for sentencing after a guilty plea. But we do submit that the nature of Bryan's participation is a fact that the Court can and should consider at sentencing.

In fashioning an appropriate sentence, we also ask the Court to look to the nine-month sentence that it imposed on codefendant Jason Hatcher for the same wire fraud conspiracy. Now, the government does not address Hatcher's sentence or our disparity argument in what it's said here today. Instead, it's asking for the same sentence to be imposed on Bryan for wire fraud conspiracy as it asked this Court to impose on Mr. Hatcher for both the same wire fraud conspiracy and aggravated identity theft combined. And any suggestion that all of that conduct should -- can or should be considered as one for sentencing purposes is refuted by the face of the aggravated identity theft statute.

The statute that Congress passed actually prohibits courts from considering a defendant's sentence on the predicate felony underlying an

aggravated identity theft charge, quote, to compensate for or otherwise take into account, end quote, the consecutive sentence of two years for aggravated identity theft.

THE COURT: So do you think that means that it is inappropriate when sentencing an individual who has an aggravated identity theft conviction is part of the crimes of conviction, that it's inappropriate to consider the sentence as a whole and whether that ultimate sentence is a just and appropriate sentence for all of the crimes being sentenced under 3553? Because I realize that, you know, there is case law that says that, but when you actually sentence somebody, you know, at the end of the day you're coming up with a sentence that you think is appropriate overall for the crime that's been committed. And it's not as if you're sentencing somebody or two separate individuals who committed two separate crimes. So I'm trying, you know, to reconcile those things in my mind when I impose the sentence.

So do you think I can or cannot do that?

MR. PABIAN: So certainly, your Honor, we do think that the 3553(a) factors apply in all these cases and the Court on some level is required to impose an individualized sentence. But what Congress has

specifically said in this specific context is that a sentence for aggravated identity theft must be at least two years, and further, that the Courts are not able to consider the fact of that two-year sentence to reduce the sentence on the underlying felony.

THE COURT: But Congress has also said in Section 3553 that our job is to impose a sentence that is sufficient but not greater than necessary for all the stated purposes of Section 3553.

How do you reconcile those things?

MR. PABIAN: Well, I think there is some tension there certainly, and I take your point, but I don't think that abiding by the terms of that statute necessarily means that you're not imposing an individualized sentence. Certainly, courts deal with issues regarding mandatory minimum sentences all the time where in specific areas of law Congress has said, yes, the sentence must be individualized, but it has to be at least this long. And that's just what Congress has done here except to also go an additional step and say that this is an independent harm, it's a significant, independent harm in Congress's view, and the sentence for that offense cannot be reduced by consideration with the underlying predicate felony.

And I also think that aggravated identity theft

is a little unique in the fact that it's always or almost always committed together with an underlying predicate felony, right. So I think this is an issue that Congress knew would be a recurring issue, and I think it's spoken quite clearly as to how it should be treated in these cases. And frankly, it's not something that I've heard the government address today at all.

So you know, it's the government that asked this Court to sentence Mr. Hatcher to nine months for the wire fraud conspiracy. Certainly, I understand the Court's view and I understand the government's argument that perhaps Bryan is not substantially less culpable than Mr. Hatcher -- I disagree with that, but I understand it -- but the government said nothing here to suggest that Bryan is substantially more culpable than Mr. Hatcher. What it's asking the Court to do in effect is to impose a sentence more than three times as long upon Bryan as it did on that codefendant for the same underlying wire fraud conspiracy.

Mr. Hatcher and Bryan are different in other ways than the nature of their conduct as we've already discussed here today. Mr. Hatcher has a serious criminal history. In the government's words at his sentencing, he had, quote, at least two serious prior

convictions for guns and drug distribution, end quote. And he had, quote, basically engaged in one criminal activity after another for the last several years.

Now, I think we all know that's not Bryan -- he has no significant criminal history -- so the defense submits that Bryan's sentence should be significantly lower than nine months to avoid an unwarranted sentence in disparity with Mr. Hatcher. Ultimately, as your Honor just mentioned, the question that this Court must answer is what sentence is sufficient but not greater than necessary in this particular case. The defense submits that sentence is probation.

Bryan is a good person who I am confident will not find himself before this or any other court in circumstances like these ever again. He has learned a hard lesson and is determined to do better. We ask that the Court permit him to stay at home with his mother for whatever time left he has remaining in this country. And if given a second chance by the Court, I believe that Bryan has great potential to be a force for good in this community in the future. Thank you, your Honor.

THE COURT: All right. Thank you, Mr. Pabian.

All right. Mr. Valdez, do you wish to say anything before I impose the sentence?

THE DEFENDANT: Yes.

Your Honor, Judge Smith, I want to express my sincerest gratitude for giving me this opportunity to express my thoughts and feelings today. This event has been a life-changing experience for me and for the victims, and I will never forget the lessons I've learned from it or the pain they have suffered.

I want to take this opportunity to express my feelings towards the victims who were affected by this event. I understand that this has been a very difficult time for them, and my heart goes out to them. I can only imagine the emotions and stress they must have experienced, and I want them to know that I am deeply sorry for my role in causing that.

I have also learned from this experience the importance of good judgment. I now understand the significant impact or choices can have on our lives and the lives of those around us, not only the victims, but also my family as well. I have come to realize every decision we make has a consequence for people other than just me, and it is crucial to think through my actions carefully before making them. I am committed to making better choices from now on, and I will never be involved into anything like this again. Thank you, your Honor.

THE COURT: All right. Thank you. You can sit for a few minutes. I'll make a couple of comments, but I don't intend to speak too long.

This is one of these somewhat unusual cases where there are two sides to the question here that are so diametrically opposed that you would think that you're not even looking at the same case. On one hand, you have the victims who are represented here by the government and by the victims who have spoken, both in this case and also in the prior case, as well as through their submissions, who speak to a level of harm that goes so far beyond the amount of money that is involved in the fraud to detail the sort of deep emotional/psychological scarring that has occurred as a result of the crime so that this isn't just a financial crime, even though it presents as a financial crime, but it's one that has a deep personal, offensive character to it such that the victims feel, very understandably, that, as Ms. Merolla said so well, that there is the feeling that, you know, the person has been stolen from the family, that the parents have been stolen from the family and, as she said, she would have you -- all the defendants locked up forever because of the harm that's done. That's one side.

And on the other side is the arguments,

excellent arguments, that Mr. Pabian makes on your behalf and your own presentation here as, you know, what appears to be a decent young man who has a lot of potential, doesn't have any criminal record and has a lot of empathy and care for people in his life.

How do you reconcile these two things? Like I said, it's hard to imagine that this is the same defendant and the same crimes that we're talking about here. They're so diametrically different. Can both of them be true? And I think unfortunately they both can be true. I think sometimes people who are generally good people do really bad things and sometimes they do really stupid things, and almost always they don't realize the consequences of what they're doing; only until later do they come to the realization of just how much harm they have created.

So what does a sentencing judge do with all of that? It's impossible for me to reconcile these two things in some magical way. I don't have a magic approach to sentencing that solves this conundrum, but I do have some rules of thumb that I go by and they may not be perfect or even, you know, ideal in any way, but one of the rules of thumb that I have applied in these kinds of -- generally, in financial crimes is that when you steal this amount of money, it harms the victims,

and I see this over and over again not just in grandparent scams but in all kinds of financial fraud, whether it's Ponzi schemes or just individual fraud and theft, when it happens, in almost every case prison time is a consequence. It is very, very unusual for me to see a case where the frauds involve this kind of money and the harms are what they are, for me to come to a conclusion that a probationary sentence is appropriate. I'm not saying it's impossible, but I'm not sure I've seen that case.

So I think a time -- a prison sentence is absolutely called for in this case. So the question is, what's the appropriate amount of prison? Mr. Pabian has made some very creative and intelligent arguments about how to reconcile this case with the other cases or not reconcile them that are involved, but I take a more basic holistic approach to all of this, which is you've got three defendants here as I see it, Hatcher, Alarcon and you, and how are these defendants, based on what I know from all the information that I have, how are they similar, how are they different?

They are largely the same in terms of their involvement. There are arguments that have been made why one should be a little more responsible than

another, and those arguments, I think they have some merit. I mean, for example, any defendant that actually met the elderly victims on more than one occasion you could say, well, every one of those occasions was an opportunity for that defendant to realize what a terrible thing he's doing and to stop; I mean, you could say that. Or you could say, as Mr. Vilker did, diving deeper into the text messages and calls and so forth, that maybe you were pulling some more strings than it appears on the surface and maybe you were in more contact with people higher up than the others were.

You could also do what Mr. Pabian suggests and say, well, wait a second, Hatcher had an aggravated identity theft count and my guy doesn't have that. Or you could say that was in play in the Alarcon case and they have got a binding plea. So all of these things are true and they're all -- none of them is incorrect. But I look at it like we've got three defendants who basically did this aspect of this grandparent scam, and they all look pretty similar across the board to me. We could make a little adjustment here and a little adjustment there, but basically these three are all doing this part of the conspiracy together and so I think they ought to receive similar sentences.

Now, Hatcher did have aggravated identity theft; that is a separate count. You don't have that. And Alarcon doesn't have that either, but I guess you drop that as part of the binding plea. So where I come down when you boil all this down -- it's not perfect, it doesn't reconcile at all -- but where I come down is a sentence of 30 months and that's what I'm going to impose in this case. You'll have the chance hopefully to reduce that if you do the things that you have the ability to do. And you will be out soon and you'll still be a very young man, and you'll have the opportunity to make things as right as you can make it by making restitution and by straightening up and getting your act together and living right.

As Mr. Pabian said, and has been said many times, you're not defined by the worst thing you ever did in your life. You seem to be a good person. You seem to have a lot of qualities and a lot of capabilities. And you'll serve your time and you'll be done with it, and hopefully you will come out and capitalize on the things that you have, positive things that you have, and you won't let this define who you are. So I'm going to ask you to stand at this point.

In the matter of the United States vs. Bryan Espinosa-Valdez, the defendant is remanded to the

custody of the Federal Bureau of Prisons for a period of incarceration of 30 months to be followed by three years of supervised release. As special conditions of his supervised release, in addition to the standard conditions, the defendant will participate in a program of substance abuse testing, up to 72 drug tests per year, as well as a manualized behavioral therapy program as directed by the probation office. He may be required to contribute to the cost of his treatment and testing if he has the ability to pay.

He will provide access to all financial information requested by his probation officer including, but not limited to, copies of federal and state income tax returns. He shall file all his tax returns in a timely manner. He may not open any new lines of credit which include leasing any vehicles or other property or use any existing credit resources without the prior approval of his probation officer until all of his court-ordered financial obligations have been satisfied.

The defendant will maintain one personal checking account. All of his income, monetary gains and pecuniary proceeds will go into that account which may be used for his personal expenses. And records of his bank accounts, including business accounts, must be

disclosed to his probation officer upon request.

The defendant may not transfer, sell, give away or otherwise convey any asset with a fair market value in excess of $1,000 without the approval of his probation officer until all of his financial obligations have been satisfied. The defendant may not hold any employment with fiduciary responsibilities during his term of supervised release without first notifying the employer of his conviction. The defendant will not hold self-employment having fiduciary responsibilities without approval of his probation officer.

And finally, the defendant will cooperate with the probation office in the investigation and approval of any self-employment including any independent entrepreneurial or free-lance employment and file all applicable forms if he's approved.

Now, the restitution amount, I believe as adjusted, is $262,240; is that correct, Mr. Vilker?

MR. VILKER: Yes, that's absolutely correct, your Honor.

THE COURT: All right. And there's no fine. A special assessment of $100 is imposed.

Interest waived on the restitution. And joint and several with the two other defendants.

Did the defendant have a plea agreement with a waiver in this case?

MR. VILKER: He did, your Honor.

THE COURT: All right. So Mr. Valdez, your plea agreement contains a waiver of your right to appeal if the sentence was within or below the guideline range. The sentence I've imposed is below the guideline range so the right to appeal -- my understanding is the right to appeal is therefore waived.

Defendant will surrender to the United States Marshals March 13th, 2023, at 12:00 noon. If you are designated to the Federal Bureau of Prisons facility that you'll be serving at prior to that date, which you may be, than you can report directly to the facility itself.

Okay. All right. Is there anything further from the government?

MR. VILKER: No, your Honor. Thank you.

THE COURT: Anything further, Mr. Pabian?

MR. PABIAN: No, your Honor.

THE COURT: All right. Very well. We will be in recess. Thank you.

THE CLERK: All rise.

(Proceedings concluded; 1:26 p.m.)

**CERTIFICATION**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Official Court Reporter                    February 26, 2024